OLIVER K. DAY, receiver, &c., respondent,

*v.*

RUSSELL C. STOKES et al., appellants.

[Decided January 19th, 1925.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"The defendant Russell C. Stokes invented a machine for which he had obtained letters patent of the United States

by ·a written agreement which bears date October 1st, 1920, made between him and the Stokes Manufacturing Company, a Delaware corporation, he agreed to transfer to the corporation all his right, title and interest in said invention, together with all his patent rights and privileges, including his letters patent, in consideration of the issue to him of five thousand shares of preferred stock and thirty thousand shares of common stock of said corporation. The letters patent were never actually assigned, and this suit is brought to compel Stokes to specifically perform his agreement to assign. His defenses are that the agreement was negotiated, consummated and executed in this state before the corporation was authorized, as required by section 97 of our Corporation act, to transact business in this state; that the stock consideration to be paid under said agreement has not been issued to him; that the corporation subsequently canceled the agreement, and that the corporation is in laches in instituting this action.

"The corporation ratified and accepted the agreement at a meeting of its directors, held in this state October 9th, 1920, and the certificate of the secretary of state of New Jersey that the corporation was authorized to transact business in this state was issued December 8th, 1920. The bill of complaint was filed March 16th, 1922. Section 98 of the Corporation act bars a foreign corporation from maintaining any action upon a contract made in this state, "until such corporation so transacting business shall have obtained said certificate of the secretary of state." Such certificate having been obtained prior to the filing of the bill of complaint, this action may be maintained, notwithstanding the provisions of sections 97 and 100 of the Corporation act.

"At the first meeting of the incorporators of the company, held October 6th, 1920, Stokes was elected a director, and at the first meeting of directors, held October 9th, 1920, he was elected president. At this meeting of directors, a resolution was unanimously adopted, reciting Stokes' offer to assign his letters patent to the company for the consideration above mentioned, accepting the offer, authorizing the execu-

tion of such agreement as might be necessary for the pur-
chase of the patent rights, and also authorizing the issuing
and delivery of certificates of stock to Stokes, or his nomi-
nees, for the number of shares of stock, common and pre-
ferred, which were the agreed consideration for the transfer
of the patent. At this meeting, or immediately thereafter,
the officers of the company were about to issue the certifi-
cates of stock to Stokes, when he and they were informed
that revenue stamps to the value of nearly $2,000 would be
required to be affixed to the certificates, and since it was
Stokes' intention to sell, or otherwise dispose of some of his
shares, it was agreed between him and the other officers of
the company that instead of issuing certificates to him for
the full amount of stock to which he was entitled, such
certificates should be issued to his nominees, as he might
from time to time direct, and thereafter, from October 27th,
1920, to June 6th, 1921, he gave written directions to the
corporation to issue shares of common stock for a total of
thirty thousand, and to charge the same to him. At a meet-
ing of the directors, held June 6th, 1921, at which he was
present, a written communication, dated June 1st, 1921,
from him to the corporation was read, in which he recited
his agreement to sell his patent rights and interests to the
corporation for a consideration, part of which was five thou-
sand shares of the preferred stock of the corporation, and in
which he said that such preferred stock had not been issued
to him, and believing that the interests of the corporation
required that he should cancel that obligation on the part
of the corporation, he agreed to cancel it, whereupon a mo-
tion was passed which is not clearly expressed in the minute
book, but which I construe to be no more than an acceptance
of Stokes' offer to cancel the corporation's obligation under
its agreement, to issue to him five thousand shares of its
preferred stock. His counsel argues that the true construc-
tion of this motion, as it appears in the minute book, is to
annul the whole agreement made by Stokes to assign his
patent to the corporation; but, considering all the circum-
stances of the case, especially the wording of his written

offer, I cannot interpret the motion to mean that the directors of the corporation intended to give up what was practically the only valuable asset owned by the corporation.

"The agreement on Stokes' part to assign his patent to the corporation, is clear and unambiguous. From October 6th, 1920, to June 8th, 1921, Stokes was a director and president of the corporation. He was active in its management and in its endeavor to manufacture and sell machines. The minutes of the many meetings of the directors, held during this period, at all of which meetings he was present, and the testimony of witnesses, show that the corporation dealt with the patent as its absolute property; that it built machines thereunder and sold one or two; that it entered into contracts with sales agents for marketing machines; that its employes made alterations and improvements on the machines and paid for such alterations and improvements with company moneys; that it received from Stokes and an employe of the corporation an assignment of an application for letters patent for an improvement which Stokes said he had made on the machine; that it sold corporate stock upon statements made to purchasers, in which statements Stokes participated, that the corporation owned the letters patent; that Stokes stated to various persons that he had assigned his patent rights to the corporation, and that the corporation was the owner thereof. It was not until August 12th, 1921, that Stokes questioned the corporation's ownership of the letters patent. By a writing under that date, addressed to the corporation, he demanded the return of all interest in the invention and letters patent, or payment forthwith of five thousand shares of preferred and thirty thousand shares of common stock, and on August 26th, 1921, he caused to be recorded in the patent office his written abrogation of his agreement to assign the patent to the corporation. All the evidence shows that Stokes had agreed and intended to assign the letters patent to the corporation; that he and the directors of the corporation believed that the corporation was the absolute owner thereof; that Stokes voluntarily waived·

payment of the consideration for the assignment to the extent of five thousand shares of preferred stock, and that he or his nominees received and still hold thirty thousand shares of the common stock, the balance of the consideration.

"Thus, the corporation performed its part of the agreement and Stokes should be decreed to perform his part, unless the corporation was in laches in bringing this suit, and because of such laches it would be inequitable now to require Stokes to perform. It was about the middle of August, 1921, that the officers and directors realized that the corporation was not the record owner of the patent. A controversy over the ownership of the patent had then arisen with Stokes, and a few weeks afterward he recorded his assignment of the patent to the defendant Alice G. Stokes. Negotiations were entered into between the parties looking toward a settlement of their differences, which continued several months. The practicability of the machine had not been demonstrated, the corporation could not continue manufacturing because of the opposing claims of patent ownership, and it could sell no stock because the patent rights were its only valuable asset. It fell into financial difficulties, and, after this suit was commenced, it was adjudged insolvent, and the present complainant, Oliver K. Day, is its receiver. Its financial difficulties can, in a large measure, be attributed to Stokes' failure to perform his contract and his assertion of ownership of the patent and his subsequent assignment of it. With the record ownership of the letters patent in the corporation, it might have manufactured and marketed machines, and its stock might have had value. If the defendant Stokes is now compelled to assign the letters patent to the receiver of an insolvent corporation he will be in no worse position than other stockholders, in whose interest this action is brought, who purchased their stock on the faith of his contract to assign. If this action has not been prosecuted promptly he is not without fault because he has always been in a position to bring it to final hearing or have the bill dismissed.

"The defendants Russell C. Stokes and Alice G. Stokes insist that Russell C. Stokes cannot be decreed to assign the letters patent because he is not now the owner thereof, he having assigned them to the defendant Alice G. Stokes, by assignment dated August 25th, 1921, recorded in the patent office August 27th, 1921. I do not regard Alice G. Stokes as a *bona fide* assignee without notice of the corporation's rights. She is the wife of Bordeaux W. Stokes, a brother of Russell C. Stokes, who was elected a director of the corporation October 6th, 1920, and treasurer October 9th, 1920, who retained both of these offices until July 11th, 1921, and who attended every directors' meeting. On behalf of the corporation, Bordeaux W. Stokes executed the agreement with Russell C. Stokes, whereby the latter agreed to transfer his patent rights to the corporation. He was the owner of a large number of shares in the corporation, and he knew that the corporation claimed to be the owner of the patent. Alice G. Stokes became a stockholder December 14th, 1920, when two shares of common and ten shares of preferred stock were issued to her, and on July 1st, 1921, she acquired eight additional shares of the common stock. As the wife of Bordeaux W. Stokes, and as a stockholder in the corporation, she must have known of the agreement of her brother-in-law to transfer his patent rights to the corporation long prior to his assignment of such letters patent to her. Finally, the agreement between Russell C. Stokes and the corporation was recorded in the patent office August 18th, 1921, and she, therefore, took her assignment with notice of all rights to which the corporation was entitled under its recorded agreement with Russell C. Stokes.

"The assignment from Russell C. Stokes to Alice G. Stokes will be set aside, and the defendants will be decreed to release and assign all their interest in the letters patent to the receiver of the complainant corporation."

*Messrs. King & Vogt,* for the complainant.

*Messrs. Bolitho & O'Connor,* for the defendants.

Camp v. Krulewitch.                    97 N. J. Eq.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, MCGLENNON, KAYS, JJ. 14.

*For reversal*—None.