LOUIS P. BAURHENN, PLAINTIFF-APPELLANT, v. FIDEL-ITY AND DEPOSIT COMPANY OF MARYLAND, DE-FENDANT-RESPONDENT.

Submitted October 26, 1934—Decided January 10, 1935.

For the appellant, *Patrick H. Harding*.

For the respondent, *Fred G. Stickel, Jr.*

The opinion of the court was delivered by

CAMPBELL, CHANCELLOR. This is an appeal from a judgment in favor of the defendant below entered upon a verdict directed in its favor.

One Lyon and two others associated with him had been apprehended on a criminal charge and brought before a magistrate in Philadelphia who fixed bail for all three in sums aggregating $3,100. To secure his immediate release in the custody of his attorney, one Frye, a member of the Pennsylvania bar, Lyon deposited a diamond ring and turned over the possession of an automobile.

Lyon then appealed to his friend, the plaintiff below, to aid him in securing proper bail bonds for himself and two associates and induced him to deposit $3,100 with the defendant company. This was accomplished by a draft for that amount upon the Howard Savings Institution of Newark and deposited at the defendant's branch office in Newark.

The bail bonds were duly furnished by the defendant company which, thereupon, entered into an indemnity or collateral security agreement with the plaintiff respecting the $3,100 that had been deposited by the latter with the former. This bears date January 9th, 1933. It provides, *inter alia:*

"Eighth. That the surety shall upon its being furnished at its home office with evidence satisfactory to it of the termination of said bond or bonds without claim thereon or without the surety's having any notice or knowledge of facts tending to indicate a claim thereupon and without loss, costs, damages, expenses, attorney's fees, or liability therefor, as aforesaid, and upon the payment of all premiums, and of all other indebtedness, as aforesaid, surrender to the owner, said collateral upon the return of this instrument with a receipt endorsed hereon."

On February 28th, 1933, while the bail bonds were still in effect, but when a settlement of the criminal proceedings against Lyon and the other two defendants was apparently imminent, the plaintiff wrote the defendant respecting the repayment and distribution of the $3,100 he had deposited, as follows:

"Gentlemen: With reference to the bond of $3,100 on deposit for Nelson F. Lyon, Leroy Stager and one other will you kindly arrange to pay Michael C. Goglia, Philadelphia lawyer, the sum of $500 as his fee, providing Nelson F. Lyon, Leroy Stager and one other, have been cleared of all charges by the Commonwealth of Pennsylvania and return the balance of $2,600 to me after they have been released by the Commonwealth of Pennsylvania."

In some unexplained manner the fee of $500 to Goglia, above referred to, seems to have been split so that $150 was to go to one Cahill and the balance of $350 to Goglia. Just what positions Goglia and Cahill occupied or who they represented does not definitely appear. There is, however, no suggestion that they, in any manner, represented the plaintiff. The letter of February 28th, 1933, before referred to, was returned by the defendant to the plaintiff to be authenticated before a notary. This the plaintiff did and turned it over to Lyon who it appears placed it in the possession of his attorney, Frye, who delivered it to the defendant.

Later, and in the month of April, 1933, when it appeared that the criminal charges against Lyon and others would be dismissed and the bail bonds furnished by the defendant would be released, Frye was advised by the latter that there must be obtained from the plaintiff the security agreement in his possession with the receipt attached thereto executed. Plaintiff signed the receipt and placed the agreement in the hands of Lyon who turned it over to Frye who presented it to the defendant and it being satisfied with the genuineness of plaintiff's signature upon the receipt returned the paper to Frye, directing him that the paper should be at hand for delivery to its representative at the Magistrate's Court at the time the charges were dismissed and the bonds discharged.

On April 18th, 1933, there was an appearance before the city magistrate in Philadelphia and there were in attendance Nelson Lyon, his brother, and one Stager, being the three defendants for whom the bail bonds were furnished, Henry A. Frye, Lyon's attorney, John J. Cahill, an attorney for the pastor of some church who probably was the complaining

witness in the criminal proceedings, Michael C. Goglia, an attorney, a Mr. Barrett, representing the defendant company and Magistrate O'Hara.

The magistrate announced that Lyon and the other defendants were discharged.

Barrett, the representative of the defendant company, had four of its checks; one payable to Goglia for $150 and by him endorsed over to Cahill; one payable to Goglia for $350; one for $62, for the premium due for the issuing of the bonds; and one for the balance of the deposit amounting to $2,538 to the order of the plaintiff, and upon the discharge of the defendants he made delivery of these checks to the parties to whom they respectively belonged except the check to the order of the plaintiff for $2,538 which he delivered to Henry A. Frye.

As the parties were leaving the Magistrate's Court Nelson F. Lyon was served by a constable with a warrant under another criminal charge in which Father Thomas F. Ryan, of St. Columbus Church, of Philadelphia, was the complainant, and he was again taken into custody. The magistrate fixed his bail at $2,500 but finally it was agreed to settle the matter for $1,500. Frye asked George A. Butler, the attorney for Father Ryan, to take Lyon's check for this amount but he declined to do so. Frye says that it was then suggested that he endorse and deposit the check of the plaintiff for $2,538 to his own account and draw against it and deliver his own check to the attorney of Father Ryan for $1,500. Frye further says that Lyon said he would telephone to the plaintiff and seek his authority for so doing. That Lyon repaired to a telephone booth and later returning told Frye it was all right. Lyon knew the plaintiff was then ill and so told Frye. There appears to be no doubt but that Lyon did telephone the home of the plaintiff, who was ill and confined to his bed; that his daughter took the message which was that Lyon was in further trouble in Philadelphia, needed another bond for $1,500 and requested the permission of the plaintiff to leave the balance of $2,538 with the defendant company and have it issue the new bond for his release and that the plaintiff consented to this.

This, however, was not done but what did take place was that Frye endorsed plaintiff's name to the check for $2,538, deposited it in his "attorney" account in his own bank, issued against it his check for $1,500 which was delivered to Butler, attorney for Father Ryan, which check was paid. When later Frye endeavored to get his acts ratified by the plaintiff he found that the plaintiff had not given Lyon permission to use the check in the manner that it was but simply to redeposit it with the defendant as security for a further bail bond.

It was then claimed that because of this new charge by Father Ryan the attorney Goglia had not fully performed his agreement entitling him to the payment of the check he held for $350 and at the request of the plaintiff the defendant stopped payment thereon with the result that Goglia threatened the defendant with suit to enforce its payment.

The plaintiff denies that Frye was his attorney or in anywise represented him and says that the only time he saw him was an occasion when he, the plaintiff, was returning home with Lyon and the latter stopped at Frye's office; plaintiff at that time remaining in the waiting room until Lyon had transacted whatever business he had with Frye. Frye does not say he represented the plaintiff but does say he was acting during the entire proceeding "for Nelson Lyon, his brother, I do not recall his first name, and Leroy Stager."

The plaintiff never received any part of the $2,538. He brought suit against the defendant seeking a recovery of $2,888, being the amount of the check for $2,538, and the stopped check to Goglia's order of $350.

At the conclusion of the trial the defendant moved a direction of verdict in its favor on two grounds:

1. That the possession of the collateral agreement and receipt by Frye created a presumption which had not been rebutted that he as the holder of it was entitled to receive the check for the plaintiff and that upon his receipt thereof the defendant's responsibility ended.

2. That under the collateral agreement itself the defendant was not required to return any of the collateral deposited

until all claims against it or likely to arise in connection with the transaction, legally to arise out of the execution of the bonds or release of the collateral or any other phase of the transaction had been disposed of.

The trial judge granted the motion and directed a verdict in favor of the defendant without stating any ground or reason therefor.

As to the first ground which was presented for the direction of verdict the appellant urges that a jury question was presented.

It appears that the contention of the defendant-respondent is that, inasmuch as Frye was in possession of the collateral agreement with appellant's receipt thereon this raised a presumption that Frye was appellant's agent to receive payment and that payment having been so made the transaction was closed and the respondent could not further be called upon. This seems to have been upon the insistence that there was no proof to rebut or overcome such presumption. In support of this *Elliott* v. *Bodine,* 59 *N. J. L.* 567; *J. Wiss & Sons* v. *Vogel Co.,* 86 *Id.* 618; *Law* v. *Stokes,* 32 *Id.* 249, and *Borcherling* v. *Katz,* 37 *N. J. Eq.* 150, are cited.

The principles involved in all of these is well summed up in *J. Wiss & Sons* v. *Vogel Co., supra,* as follows:

"As between the principal and third persons the true limit of the agent's power to bind the principal is the apparent authority with which the agent is invested. The principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. And the reason is that to permit the principal to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. * * * The question in every such case is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business is justified in presuming that such agent has the authority to perform the particular act in question, and when the party relying upon such apparent

authority presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury."

Now in the case before us there is no affirmative proof of express authority to Frye to act as the agent of the appellant in any capacity, but as before said, it is asserted that Frye, being in possession of the collateral agreement receipted by the appellant, there was created a presumption that he was the latter's agent for the purpose of receiving payment.

But unquestionably a jury question was presented.

"The mere possession by an agent of a copy of an account due his principal does not give him authority to collect the debt evidenced thereby. But the agent's possession of a receipt signed by the creditor confers on him ostensible authority to receive payment, although it has been held that a payment made by a purchaser to his agent upon presentation of a receipt signed by the seller is not good against the seller where it appears that the agent represented to the seller that it was necessary to give a receipt before he could get the money from his principal." 2 *C. J.* 623, § 259.

"The mere possession by an agent of notes or other securities evidencing an indebtedness, *although a fact to be considered,* does not of itself confer authority upon such agent to receive payment thereof, as where he has possession of unendorsed notes. But where the securities are properly endorsed or assigned by the principal to the agent this confers ostensible authority to receive payment, as where the agent has possession of negotiable instruments duly endorsed or payable to bearer." 2 *C. J.* 623, § 260.

"The mere possession of a bond and mortgage by an agent and the habitual payment of interest to the agent, who in turn remits to the mortgagee, does not establish the agent's authority to receive the principal, so as to create an estoppel against the mortgagee. The agent's authority to receive the principal in such a case is not a question of law but is to be regarded as a fact—a question for the jury." *Dorman* v. *W. J. Title and Guaranty Co.*, 92 *N. J. L.* 487.

Our attention is also directed to *Haines* v. *Pohlman,*

25 *N. J. Eq.* 179, where Chancellor Runyon said: "It is well settled, that the debtor is authorized to infer that an attorney or scrivener, who has been employed to make a loan, is empowered to receive both principal and interest, from his having possession of the bond and mortgage given for the loan or of the former only. But the *inference* in these cases is founded on the custody of the securities and it ceases whenever they are withdrawn by the creditor and it is incumbent on the debtor who makes payment to the attorney or agent, relying upon such *inference,* to show that the securities were in his possession on each occasion when the payments were made."

This is not different from what has gone before. It must be remembered that this was a cause in Chancery where the chancellor not only declared equitable principles but was the trier of the facts. He holds that the possession of the bond and mortgage or of the bond alone created an inference of the right of the possessor to receive payment but he also considered and passed upon (as would a jury in an action at law) the facts.

There is still a further matter that must be considered and that is that it might be successfully argued that, although Frye did not have direct authority from appellant to act for him in receiving the check in question, yet Nelson F. Lyon may be said to have been plaintiff's agent for that purpose and he, in turn, delegated that authority and duty to Frye.

But, "as a general rule an agency to collect and receive money is one of personal trust and confidence, and, therefore, cannot be delegated to another, unless the agent is specially authorized to do so." 2 *C. J.* 687, § 344.

Everything considered, it can, at best, be said that the matters raised by the first ground for direction presented questions of fact to be submitted to the jury and not a question of law and, therefore, make no substantial or legal ground upon which the direction can be supported.

The second, and remaining point, urged for a reversal is that the court erred in admitting in evidence *Exhibits D-5* and *D-6*. These are respectively a letter of M. C. Gogha

to the defendant under date of April 25th, 1933, calling attention to the fact that its sight draft No. 31238, dated April 8th, 1933, drawn to Goglia's order for $350 had been returned marked "payment refused" and demanding payment thereof on or before April 28th or suit would be commenced and a letter from John J. Cahill to the defendant under date of August 31st, 1933, advising it that he had been retained by Goglia in the matter of the unpaid draft of $350 and asking to be informed whether payment would be made without suit and, if so, that defendant's check be sent to him and, thereupon, he would return the draft upon which payment had been stopped.

It is urged that these proofs were improper because they were not relevant to any issue raised by the pleadings.

The pleadings consisted of a complaint, answer and counter-claim, reply and answer to the counter-claim.

An examination and analysis of these will disclose that the issue raised by the complaint, answer and reply is that the plaintiff asserts that he is entitled to recover the sum of $2,888 which is denied by the defendant upon the single ground or defense that it owes plaintiff nothing because it paid him in full and the transaction was completed and finally concluded when on April 18th, 1933, it turned over to Frye its draft to his order for $2,538.

Under the counter-claim and the answer or reply thereto the issue raised is that the defendant asserts that the plaintiff breached his contract with it respecting the disposition of the funds and seeks to recover the cost it had been or anticipated it would be put to because thereof. This breach the plaintiff denies.

Consequently from none of the pleadings can it be found that the defendant asserted as a defense that there could be no recovery because the plaintiff had failed to meet and keep the conditions of the indemnity agreement and therefore was not entitled to any portion of the money deposited.

However that, apparently, was the purpose of the offer of *Exhibits D-5* and *D-6,* because, upon objection thereto by the plaintiff "as having no bearing upon the case," the trial

judge in overruling the objection and admitting them said, "I will allow it. It has to do with the fact that the matter is not disposed of yet. That is the theory of it and I think it is evidential on that."

Counsel for the defendant, in making the offer, presented no reason or purpose and made no objection to the foregoing statement by the court, and, therefore, we must assume that the court's statement was correct.

Counsel for the respondent-defendant, says in his brief, that the point now here made was not raised in the trial court, but we think it was sufficiently raised. Again, that the third ground of appeal does not sufficiently raise the alleged error in that nowhere therein "is there any statement that defendant's answer to paragraph 3 of plaintiff's complaint made the letters in question inadmissible or estopped the defendant from offering them." We conclude, however, that this was not necessary.

The third ground of appeal is: "That the court, over objection, erroneously permitted testimony to show a threatened suit against *plaintiff* [*appellant*] by one Michael Goglia, which testimony was not relevant to the issue in the cause."

It is true that the ground is incorrect because it refers to testimony respecting a threatened suit "against plaintiff [appellant]." This is not so. It was a suit threatened against the *defendant-respondent*. Again, it does not present, with the particularity that it should, the exact testimony toward which it is directed, but we pass this because the pertinent and substantial question before us is not necessarily and directly raised by this ground but rather by the first ground alleging error in directing the verdict.

As we have previously shown there were only two grounds presented. The first we have disposed of by finding that questions of fact were involved requiring submission to the jury.

The second ground was that the proof furnished by *Exhibits D-5* and *D-6* established the fact that there was a claim outstanding against the defendant for which it might be found it was liable and that being so it was not liable for

nor could it, under the indemnity agreement, be called upon to repay to the plaintiff any part of the sum deposited.

As we have already pointed out this was not within any issues tendered or raised by the pleadings and therefore could not form a legal or proper basis for the direction of the verdict.

The judgment under review is reversed and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, LLOYD, CASE, BODINE, DONGES, HEHER, PERSKIE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ.   14.