58 N.J. Super. 542 (1959)
156 A.2d 737
REYNOLDS OFFSET CO., INC., A CORPORATION OF NEW YORK AUTHORIZED TO DO BUSINESS IN NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ALEXANDER SUMMER AND EDITH SUMMER, A PARTNERSHIP T/A ALEXANDER SUMMER CO., AND JAMES E. HANSON AND ROBERT E. BLACKFORD, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 9, 1959.
Decided December 22, 1959.
*545 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Benjamin H. Chodash argued the cause for Reynolds Offset Co., Inc., appellant, respondent on cross-appeal and cross-appellant (Messrs. Krieger & Chodash, attorneys, Mr. Leon S. Wolk on the brief).
Mr. Charles E. Villanueva argued the cause for Alexander and Edith Summer, a partnership, appellant, respondent and cross-appellant (Messrs. Van Riper & Belmont, attorneys).
Mr. John J. Gibbons argued the cause for James E. Hanson, cross-appellant and respondent (Messrs. Crummy, Gibbons & O'Neill, attorneys).
Mr. Horace F. Banta argued the cause for Robert E. Blackford, cross-appellant and respondent (Messrs. Winne & Banta, attorneys, Mr. Bruce F. Banta on the brief).
The opinion of the court was delivered by HANEMAN, J.A.D.
Plaintiff filed suit demanding judgment of $30,000, (1) against Alexander Summer and Edith Summer, a partnership t/a Alexander Summer Co. (Summer Co.), upon an alleged breach of a contract of guarantee of subletting, asserting that it had been executed by their agents, James E. Hanson (Hanson) and Robert E. Blackford (Blackford); and (2) against Hanson and Blackford upon the alternative grounds of (A) misrepresentation of their respective authorities as agents for Summer Co.; (B) fraud in asserting that they had authority to act as agents for Summer Co. in negotiating for and agreeing to the guarantee; and (C) breach of contract, asserting that they were personally liable on the guarantee.
*546 Summer Co. denied the authority of Blackford and Hanson to execute any instrument of the nature of that upon which suit was brought and cross-claimed against them for any judgment which might be entered against Summer Co. Summer Co. as well counterclaimed for the $6,500 commission participation paid to Bernard Burlakoff (Burlakoff), plaintiff's president, upon the ground that he was fraudulently represented as a duly licensed broker who aided in bringing the parties together, and that the sums paid to him were represented as being for his sole benefit, all of which statements were allegedly false.
Hanson (1) denied signing the letter of guarantee; (2) denied making any representations to plaintiff as to his or Blackford's authority; (3) denied that the complaint stated a cause of action against him, since the actions against Summer Co. contain inconsistent statements of fact; (4) sought indemnification and exoneration from Summer Co., since the action grew out of acts done by him with authority from Summer Co.; and (5) denied the allegations of Summer Co.'s cross-claim against him. He sought contribution from Blackford in the event of a judgment against him.
Blackford (1) denied that the letter of guarantee constitutes a guarantee; (2) denied that there was any consideration for a guarantee, and (3) denied that plaintiff sustained any loss, since it used the entire 40,800 square feet for its own purposes. He as well denied the allegations of the cross-claims of Summer Co. and Hanson against him.
At the conclusion of plaintiff's case the Law Division granted Summer Co.'s motion for involuntary dismissal, basing its conclusion particularly upon MacLeod v. Ajax Distributing Co., 22 N.J. Super. 121 (App. Div. 1952).
At the end of the entire case the jury rendered a verdict of no cause for action against Hanson and Blackford on the misrepresentation and fraud counts and a verdict for plaintiff against Hanson and Blackford on the individual contract count of $15,000 against each. The court, on motion, *547 dismissed the counterclaim of Summer Co. at the end of its case upon the ground that there was no evidence of fraud or misrepresentation.
Plaintiffs Hanson and Blackford moved to set aside and remold the verdict and to grant a new trial. The trial court denied the motions except insofar as they concerned damages, and directed a new trial of that issue upon the count which sought to hold Hanson and Blackford individually liable.
Plaintiff and each of the defendants appealed from some portion of the judgment and order granting a new trial. In the light of that which here follows, it will be necessary to consider, upon the appeal proper, only plaintiff's appeal from the involuntary dismissal of Summer Co. at the end of plaintiff's case; Summer Co.'s argument, advanced for the first time on this appeal, that the suit is barred by the statute of frauds, R.S. 25:1-5(b) and R.S. 25:1-5(c); and the appeal of Summer Co. from the dismissal of its counterclaim against plaintiff.

I.
Prior to argument, defendants moved for a dismissal of plaintiff's appeal and its complaint upon the ground, not raised below, that "this court and all others in the State of New Jersey have no jurisdiction to grant any relief to plaintiff on its complaint because it is a New York corporation that was not authorized to do business within the State of New Jersey prior to the making of the alleged contract upon which plaintiff's causes of action are based." We held this motion for final argument. It becomes necessary to treat thereof first.
Defendants rely upon R.S. 14:15-4, which reads:
"Until such corporation so transacting business in this state shall have obtained such certificate of the secretary of state, it shall not maintain any action in this state upon any contract made by it in this state." *548 and R.S. 14:15-5, which reads:
"When, by the laws of any other state or nation, any other or greater taxes, fines, penalties, licenses, fees or other obligations or requirements are imposed upon corporations of this state, doing business in such other state or nation, or upon their agents therein, than the laws of this state impose upon their corporations or agents doing business in this state, so long as such laws continue in force in such foreign state or nation, the same taxes, fines, penalties, licenses, fees, obligations and requirements of whatever kind shall be imposed upon all corporations of such other state or nation doing business within this state and upon their agents here, but nothing herein shall be held to repeal any duty, condition or requirement now imposed by law upon such corporations of other states or nations transacting business in this state."
and The General Corporation Law of New York, McKinney Consol. Laws, c. 23, § 218, which reads:
"A foreign corporation, other than a moneyed corporation, doing business in this state shall not maintain any action in this state upon any contract made by it in this state, unless before the making of such contract it shall have obtained a certificate of authority. This prohibition shall also apply to any successor in title of such foreign corporation and to any person claiming under such successor of such foreign corporation or under either of them."
It is a well established principle that our appellate courts will not consider questions not properly presented to the trial court when an opportunity for such presentation was available, unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest. Krieger v. Jersey City, 27 N.J. 535 (1958); Howard v. Mayor and Bd. of Finance of City of Paterson, 6 N.J. 373 (1951); Morin v. Becker, 6 N.J. 457 (1951); State ex rel. Wm. Eckelmann, Inc., v. Jones, 4 N.J. 207 (1950), rehearing denied 4 N.J. 374 (1950).
We will, however, consider this issue in spite of defendants' failure to raise the same before the trial court, in the light of the nature thereof.
In order to ascertain whether New York imposes "any other or greater * * * penalties * * * or other *549 obligations or requirements" upon foreign corporations doing business in that state without first obtaining a certificate of authorization than New Jersey imposes upon a foreign corporation similarly circumstanced, it becomes necessary to consider the statutes of the respective states and the judicial construction accorded thereto.
R.S. 14:15-4 has been construed by our courts to permit a foreign corporation which has obtained a certificate authorizing it to do business in this State, to bring suit on a contract even though such contract was made before the issuance of the certificate. Day v. Stokes, 97 N.J. Eq. 378 (E. & A. 1925).
In Delaware & H. Canal Co. v. Mahlenbrock, 63 N.J.L. 281 (E. & A. 1899), the court held that a single transaction entered into within this State by a foreign corporation not authorized to do business in this State does not amount to doing business so as to disenable the corporation to sue in the New Jersey courts.
The above-cited New York statute interdicts the bringing of a suit by a foreign corporation doing business in the State of New York upon a contract unless a certificate authorizing it to do business was obtained prior to the execution of the contract.
In International Fuel & Iron Corporation v. Donner Steel Co., 242 N.Y. 224, 151 N.E. 214, 215, 216 (Ct. App. 1926), the court had before it the then statute, which read:
"* * * No such foreign corporation doing business in this state shall maintain any action in this state upon any contract made by it in this state, unless prior to the making of such contract it shall have procured such certificate."
The court there held:
"To come within this section, the foreign corporation must de more than make a single contract, engage in an isolated piece of business, or an occasional undertaking; it must maintain and carry on business with some continuity of act and purpose.

* * * * * * * *
*550 And, finally, I would like to call attention to an interpretation of this section of the Stock Corporation Law, which I think has either been overlooked by the courts below or else not sufficiently emphasized. Taken literally, no corporation doing business in this state shall maintain any action upon any contract unless it procured the certificate prior to the making of the contract. This may be read so as to eliminate altogether the importance of the time when the corporation was doing business in the state; that is, if a contract be made before the certificate be obtained, but the corporation do no other business within the state until after the procuring of the certificate, this section, taken literally, would prevent any action on such a contract. Here would be the case of a corporation doing business in the state, and a contract made before procuring the certificate. But such is not the law. The corporation must be doing business in the state at the time of making the contract, or before procuring the certificate. This section does not apply to a corporation which is not doing business, as these words are interpreted, prior to its procuring the certificate." (Emphasis supplied.)
International, supra, is the landmark case on this subject and has been consistently and continuously followed by the courts of New York to date, and as recently as Nicolich v. Muniz Ferreira & CIA, 149 N.Y.S.2d 662 (Sup. Ct. 1956).
As far as the proofs disclose, the lease and guarantee were the first piece of business transacted by plaintiff in this State. It was an isolated transaction. No business had been done in New Jersey prior thereto. It follows that were plaintiff a New Jersey corporation seeking relief on a contract executed in New York under the identical facts here present, it would not be barred from maintaining such action in New York. Since New York does not impose any other or greater penalty upon a New Jersey corporation, under the facts here present, doing business in New York without first having obtained a certificate of authorization, than New Jersey would impose under similar circumstances upon a New York corporation, plaintiff is not barred from maintaining the action sub judice.
The motion is denied.

II.
The facts adduced at the trial are as follows: Early in 1953, plaintiff, a corporation organized under the laws of *551 the State of New York, had offices in New York City. Being desirous of securing some 20,000 to 25,000 feet of industrial space for its plant, it advertised for the same, with the result that it was contacted by a Mr. Breidenbach, a salesman for defendant Summer Co. Summer Co. was not a corporation, as its title would imply, but rather a partnership composed of Alexander Summer and Edith Summer. It was extensively engaged in real estate transactions both as principal and agent. Various phases of the business were assigned to designated departments of the partnership, i.e., house, insurance, mortgage, commercial land and investment, and industrial. In addition, it had corporate associates or affiliates which contributed to and aided in the accomplishment of the general objectives of the partnership. One of these was Alexander Summer Industrial Service Company (Industrial Service Company), which was engaged in design work, supervision of construction and some financing of industrial properties. Although a distinct corporate entity, both the Summers and defendant Hanson were stockholders in Industrial Service Company.
Hanson, the executive head of the industrial division of Summer Co., bore the title of vice-president of Summer Co. and was in complete charge of that department. He was as well a vice-president of Industrial Service Company. Some time prior to November 1953 the industrial division of Summer Co. became generally "autonomous." Hanson, although not a partner of Summer Co., participated in profits and losses of that division upon a designated percentage basis.
One of the projects of Summer Co. was a so-called "Teterboro Development." Summer Co., together with Industrial Service Company, engaged architects and engineers in furtherance of the development of that area, supervised their work, engaged contractors for their own account as well as for the account of others, and supervised the work of the contractors. Summer Co., as a broker, also sold and leased properties in the tract, arranged financing and assembled "package deals." *552 The term "package deals" as used in this connection connotes the assembling of land for a client, the design of buildings to be erected thereon, the securing of price for the construction of such buildings, the arrangement of interim and long-term financing, the rental of space in the buildings, and on occasion the subsequent sale of the premises.
Summer Co. sold a portion of said lands to Potdevin Machine Co. (Potdevin). Potdevin erected a building thereon, known as the Potdevin Building, according to plans revised by Industrial Service Company. In 1953 the Eclipse Division of Bendix Aviation Co. (Bendix) was a tenant in the Potdevin Building, having leased some 40,800 square feet. At the time of the negotiations with plaintiff, Bendix had determined to relinquish all of said space except for 15,000 square feet.
Subsequently, Burlakoff, an attorney-at-law of the State of New York, and then president of plaintiff, was introduced to Hanson and Blackford, who, together with Breidenbach, proceeded to interest him in renting space in the Potdevin Building on behalf of plaintiff.
Burlakoff and Samuel B. Rogers (Rogers), the latter having at all times been the sole owner of all of the stock of plaintiff, testified: They represented plaintiff in the negotiations for the lease of space in the Potdevin Building. Messrs. Breidenbach, Hanson and Blackford separately, and on occasions collectively, conferred with them. Hanson advised them that when he was unavailable his assistant, Blackford, was authorized to act for him. In at least one of the conversations, Hanson informed them that he was satisfied that within two years plaintiff would require the entire 40,800 square feet but that in the meantime, if plaintiff entered into a lease, Bendix would continue to sublet at least 15,000 square feet and that at the end of that period of time, if plaintiff's needs were not such as to require the entire 40,800 square feet, 15,000 square feet could easily be sublet to some other tenant at a profit to plaintiff.
*553 Hanson admitted that he was advised by Burlakoff that plaintiff required a maximum of 25,000 square feet, but denied that Burlakoff wanted assurance that 15,000 square feet of the total of 40,800 square feet would be sublet for a minimum period of two years.
Rogers further testified that the day following the above conversation he advised Hanson that plaintiff would enter into a lease for the entire space if Summer Co. would guarantee the subletting of 15,000 square feet. Hanson stated that Summer Co. would so guarantee if the necessity to sublet arose, and advised that Rogers should write a letter of proposal. Thereafter there ensued further negotiations with Hanson, Blackford and Breidenbach involving details of the rental, the guarantee, various structural items of the building, date for possession and date for final closing. Briedenbach and Hanson agreed to reduce their commissions on the rental payable by Potdevin by 50% and credit the same to plaintiff, thus reducing the net rental to be paid by plaintiff.
Rogers' testimony continued: On November 5, 1953 Anthony W. Joyce and J. Henry Richmond, Jr. (of Potdevin), Breidenbach, Blackford and Hanson (of Summer Co.), Rogers and Burlakoff (of plaintiff company) met in the Potdevin Building for the purpose of a final closing. The leases which had theretofore been prepared were submitted to the parties. Rogers and Burlakoff objected to the omission therefrom of a permission to sublet, the absence of a guarantee of subletting 15,000 square feet, and a provision concerning repairs to the premises. Rogers also requested a definite understanding on the division of commissions. Blackford advised that Summer Co. would pay Burlakoff 50% of their commissions on the transaction. A provision permitting plaintiff to sublet the premises or assign the lease was incorporated therein. The following letter was presented and signed, after having been approved by Hanson:
*554
 "Teaneck, N.J., November 5, 1953.
 Reynolds Offset Co., Inc.
 406 West 31st Street
 New York, New York
 Attention: Mr. Sam B. Rogers, President
Gentlemen:
Be assured that upon a signing of a lease between the Reynolds Offset Co., Inc., lessee, and the Potdevin Machine Company, lessor, for 40,800 square feet of space in the Potdevin Building, North Street, Teterboro, New Jersey, the Alexander Summer Co., Industrial Division assures a sub-lease of approximately 15,000 square feet of this space by January 1, 1954 without additional expense to you for a period of two years.
The lease price on this space to be sublet is to be a minimum of $1.00 per square foot, at which figure no commission is to be paid to the Alexander Summer Co. Any amount above $1.00 per square foot of the leased space is to be paid to the Alexander Summer Co. as a commission for leasing this space, however, the total amount of commission for leasing this space, however, the total amount of commission is not to exceed five percent of the total aggregate rental for said space.
 Very truly yours,
 Alexander Summer Co.
 James E. Hanson,
 Vice President.
 Accepted by:
 /s/ Samuel B. Rogers
 Samuel B. Rogers, President
 /s/ Bernard Burlakoff,
 Bernard Burlakoff, Secretary."
The following letter was as well delivered:
 "Teaneck, N.J., November 5, 1953
 Mr. Bernard Burlakoff
 32 Broadway
 New York, New York
Dear Mr. Burlakoff:
It is agreed by the Alexander Summer Company, Industrial Division, of Newark and Teaneck, New Jersey that upon receipt of commission payment for lease signed by the Potdevin Machine Company, lessors and the Reynolds Offset Co., Inc., lessees, a payment *555 of $6500.00 will be made by the Alexander Summer Co. to Bernard Burlakoff for services rendered. This payment is to be made no later than December 1/53.
 Very truly yours,
 Alexander Summer Co.
 /s/ James E. Hanson
 per
 Robert E. Blackford
 James E. Hanson
 Vice President
 Accepted by:
 Bernard Burlakoff
 Bernard Burlakoff"
Although Summer Co.'s total commission was $26,000, only 25% thereof, or the sum of $6,500, was paid to Burlakoff, and not 50% as had been agreed.
Bendix never executed a lease for the 15,000 square feet above referred to and removed from the premises. Although plaintiff attempted to sublet this 15,000 square feet, it was unable to do so. Under date of February 11, 1954 plaintiff mailed an invoice to Summer Co. for the rental of the 15,000 square feet for the months of January and February 1954. Alexander Summer Industrial Company replied by letter, which reads:
"[Letterhead of Alexander Summer Industrial Service Co.]
 Teaneck, N.J., February 5, 1954
 Mr. Samuel B. Rogers
 Reynolds Offset Co., Inc.
 406 West 31st Street
 New York, New York
Dear Mr. Rogers:
We have received in the mail today a bill from your company for rental in accordance with agreement. I do not know of any rental agreement we have with your company and I am, therefore, returning the bill to you.
 Very truly yours,
 James E. Hanson, Vice President,
 Alexander Summer Industrial
 Service Co.
 JEH:mfe
 Enc."
*556 Hanson denied that he was present at the closing on November 5, 1953 and had ever guaranteed a sublease.

III.
We will consider the grant of the motion of involuntary dismissal as to Summer Co.
A motion of involuntary dismissal at the conclusion of the plaintiff's case admits the truth of plaintiff's evidence and every inference of fact that can be legitimately drawn therefrom. DeRienzo v. Morristown Airport Corp., 28 N.J. 231 (1958); Dudley v. Victor Lynn Lines, Inc., 48 N.J. Super. 457 (App. Div. 1958).
Plaintiff sought recovery from Summer Co. upon the theory that Hanson and Blackford had the actual or apparent authority to bind the partnership by the letter of November 5, 1953, above quoted.
The facts in MacLeod, supra, are not apposite to the case sub judice. The court there said, 22 N.J. Super., at page 126:
"If we entertain the conviction that Gillson was authorized by the defendant to perform the services of a salesman, we must by reason of the collateral and supplementary nature of the promise to repurchase search the transcript of the evidence in quest of some prima facie proof that the defendant by some voluntary act on its part placed Gillson in such a situation that a person of ordinary prudence, conversant with business uses, and the nature of the particular business, was justified by the conduct of the defendant in presuming that Gillson had, beyond the authority to sell, the additional authority to obligate the defendant to repurchase the machines after the expiration of three months. We fail to discover any such evidence."
In MacLeod, supra, the theory of plaintiff was that "the authority to bind the seller of personal property to repurchase is impliedly invested in a salesman." Here we have testimony that Summer Co. was a partnership which functioned under a corporate title, engaged, as above noted in detail, not only in the customary business of a real estate *557 broker concerned with the sale and rental of premises owned by third persons, but also in the business of rendering multitudinous additional services for and on behalf of its clients and in real estate transactions on its own behalf, including the development, promotion and sale of real estate. It held Hanson out to the public as a "vice-president," further strengthening the conclusion that it was a corporation, and clothed him with extensive authority in connection with the furtherance of its business. The partnership also placed Hanson in a position to represent Blackford as his executive assistant, clothed as well with extensive powers.
For plaintiff to succeed against Summer Co. it was necessary, under the pretrial order, that Hanson and Blackford be proved to have had actual or apparent authority.
Actual authority may be express or implied. In Carlson v. Hannah, 6 N.J. 202 (1951), the court said, at page 212:
"The power of an agent to bind his principal is limited to such acts as are within his actual or apparent authority. Baurhenn v. Fidelity, etc., of Maryland, 114 N.J.L. 99, 104 (E. & A. 1934). Such actual authority may be express or implied. Implied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from the particular circumstances of the case. Implication is but another term for meaning and intention; express authority given to an agent includes by implication, whether the agency be general or special, unless restricted to the contrary, all such powers as are proper and necessary as a means of effectuating the purposes for which the agency was created. Sibley v. City Service Transit Co., 2 N.J. 458, 463 (1949); 2 Am. Jur. (Agency), § 86, p. 70. Accordingly, it is well settled that, unless otherwise agreed, the authority of an agent to manage a business extends no further than the direction of the ordinary operations of the business, including authority to make contracts which are incidental to such business, are usually made in it, or are reasonably necessary in conducting it."
"Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third *558 persons." Restatement of the Law, Agency 2d, § 8, p. 30 (1957).
In J. Wiss & Sons Co. v. H.G. Vogel Co., 86 N.J.L. 618, 621 (E. & A. 1914), the court said:
"As between the principal and third persons the true limit of the agent's power to bind the principal is the apparent authority with which the agent is invested. The principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. And the reason is that to permit the principal to dispute the authority of the agent in such cases would be to enable him to commit a fraud upon innocent persons. Law v. Stokes, 32 N.J.L. 249.
The question in every such case is whether the principal has, by his voluntary act, placed the agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question, and when the party relying upon such apparent authority presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury."
See also Ross v. Realty Abstract Co., 50 N.J. Super. 147 (App. Div. 1958).
According to the evidence of plaintiff and the inferences fairly to be drawn therefrom, the weight which appends to a motion for involuntary dismissal at the end of his case, we find that there was sufficient evidence to create a fact issue as to the existence of actual or apparent authority in Hanson and Blackford to execute the letter of guarantee and hence to raise a question of fact to be resolved by the jury. The trial court erred in granting Summer Co.'s motion for dismissal.

IV.
But, argues Summer Co., plaintiff failed to prove written authority signed by it to Hanson and Blackford to execute the purported guarantee and therefore no action may be brought thereon under R.S. 25:1-5(b); and the *559 agreement not being performable within one year from the date thereof, it was unenforceable under R.S. 25:1-5(e). The defense of the statute of frauds was not pleaded, R.R. 4:8-3, included in the pretrial order, or argued below. Accordingly, we will not now consider that argument.

V.
It is clear that the error in dismissing as to Summer Co. infects the entire trial. The issue of whether Blackford and Hanson had actual or apparent authority is the keystone, not only as to Summer Co.'s liability, but to their own liability as well. Under plaintiff's theory, if the jury finds that such authority existed, Summer Co. would be solely liable to plaintiff for any resulting damage. Blackford and Hanson's alternative liability for (1) fraud, (2) misrepresentation, or (3) individual execution of the contract by reason of warranty of authority (see Bregman Screen & Lumber Co. v. Bechefsky, 16 N.J. Super. 35 (App. Div. 1951)), will arise only if the jury finds that they lacked actual or apparent authority to execute on Summer Co.'s behalf.
It becomes unnecessary to consider the other grounds of appeal raised by the various parties as to the plaintiff's primary affirmative case, since the error in granting the involuntary dismissal requires a reversal and remand of plaintiff's entire case.

VI.
There remains for decision Summer Co.'s appeal from the dismissal of its counterclaim. Summer Co. bottomed its counterclaim upon the $6,500 paid to Burlakoff upon the assertion that Burlakoff falsely represented that the sum so paid was compensation to him for assisting in the closing of the lease  a participation in the rental commission. Actually, Burlakoff gave the money to Rogers who, in turn, deposited it to plaintiff's account. Hanson testified *560 that Burlakoff had advised him of what was to be done with the money. There can be no doubt, from the testimony, that Burlakoff assisted in the consummation of the lease transaction. There was, in any event, absent an essential element of fraud, i.e., misrepresentation. Louis Schlesinger Co. v. Wilson, 22 N.J. 576 (1956). The court did not err in dismissing Summer Co.'s counterclaim.
Reversed and remanded for a new trial on all issues, except the counterclaim, consistent with the foregoing.