**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1066-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RODNEY A. GABRIEL,

    Defendant-Appellant.

_____

> Argued October 18, 2023 – Decided March 13, 2024
>
> Before Judges Currier, Susswein and Vanek.
>
> On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment Nos. 17-05-0402 and 17-06-0485.
>
> John P. Flynn, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John P. Flynn, of counsel and on the briefs).
>
> Milton Samuel Leibowitz, Assistant Prosecutor, argued the cause for respondent (William A. Daniel, Union County Prosecutor, attorney; Milton Samuel Leibowitz, of counsel and on the briefs; James O. Tansey, First Assistant Prosecutor, on the briefs).

PER CURIAM

Defendant appeals his jury trial convictions for witness tampering, terroristic threats, and stalking. His convictions stem from conduct and speech defendant directed at members of a family after he was charged with robbing them. He contends the trial court committed several errors, but his principal argument on appeal is the terroristic-threat and witness-tampering prosecutions violated his First Amendment right to free speech.

After initial briefs were filed, both the United States Supreme Court and New Jersey Supreme Court issued groundbreaking decisions explaining when persons may be criminally prosecuted based on the content of their speech. In Counterman v. Colorado, 600 U.S. 66 (2023), and State v. Fair, ___ N.J. ___ (2024), the Courts addressed First Amendment overbreadth challenges in terroristic-threat prosecutions. In State v. Hill, ___ N.J. ___ (2024), our Supreme Court addressed a First Amendment overbreadth challenge in a prosecution for witness tampering.

The State concedes the rule announced in Fair requires us to vacate defendant's terroristic-threat convictions and remand for a new trial on those counts. Therefore, we vacate the terroristic threats convictions. The parties do

A-1066-19

not agree, however, on the impact of Hill on defendant's witness-tampering convictions.

In Hill, our Supreme Court rejected the defendant's contention the witness-tampering statute is unconstitutionally overbroad on its face. Id., slip op. at 2. The Court nonetheless held N.J.S.A. 2C:28-5(a) may have been unconstitutionally applied to the defendant because the prosecution relied on the content of his speech and the jury was not instructed how to determine whether that speech was unprotected under the First Amendment. Id., slip op. at 27. The Court held the jury should have been instructed to determine whether the defendant intended to cause the victims to engage in any prohibited acts under the witness-tampering statute.[1] Id., slip op. at 30-31.

---

[1] N.J.S.A. 2C:28-5(a) applies to a defendant's conduct that a reasonable person would believe would cause a witness or informant to:

> (1) Testify or inform falsely; (2) Withhold any testimony, information, document or thing; (3) Elude legal process summoning him to testify or supply evidence; (4) Absent himself from any proceeding or investigation to which he has been legally summoned; or (5) Otherwise obstruct, delay, prevent or impede an official proceeding or investigation.
>
> [N.J.S.A. 2C:28-5(a).]

Rather than reproduce this list repeatedly, we generally refer to these enumerated acts collectively as the "prohibited acts."

In the matter before us, defendant was prosecuted for witness-tampering based in part on the content of his speech uttered during altercations. As in <u>Hill</u>, the jury was not instructed on how to determine whether that speech was unprotected under the First Amendment. We therefore vacate the witness-tampering convictions and remand for further proceedings. We affirm the stalking conviction.

## I.

This prosecution arises from altercations between defendant and members of a family comprised of Betsa Garcia (the mother), Javier Vera-Lopez (the father), and Javier Vera-Garcia (the son). We discern the following facts from the trial record.

The family lived approximately one block from defendant. The altercations all occurred near the family's residence. On the evening of December 22, 2016, the family was parking their car in the driveway in the front of their home when defendant approached them. As Garcia was walking up the stairs, defendant said to her, "[b]**ch, f****r, mother f****r" and "why are you looking at me?" Garcia testified defendant "was very aggressive from the beginning" and said other things in English that she did not understand. Garcia and Vera-Garcia testified defendant pushed Garcia while she was walking up

A-1066-19

the stairs. Vera-Garcia and Vera-Lopez then approached defendant. Defendant swung his fists at Vera-Lopez's face. According to Garcia, defendant then demanded Vera-Garcia's cellphone and knocked his glasses off his face. The family claimed defendant picked up a rock and threatened to use it as a weapon against Vera-Lopez.

Garcia called 9-1-1 and told the dispatcher "[t]he man is coming for—for—for—for a problem with me." She described the man as a "black man" wearing an "orange t-shirt." Police officers arrived and arrested defendant. The responding officer's body-worn camera captured Vera-Garcia asking an officer, "[i]s it okay if I just check the street for my glasses, like when I was turning back away and I dropped them, like he might have snatched them? I don't know." At trial, Vera-Garcia explained that he did not know "if [he] dropped [his glasses] or [if defendant] might have snatched them."

Later that day, a complaint-warrant was issued charging defendant with robbery. From January to April 2017—while the robbery charge was pending—defendant spit on the family's cars "basically every day" and pushed their garbage cans into the street twice per week. On one occasion, defendant screamed at Garcia as she was driving and spit on her windshield. She testified, "[defendant] was rather angry and he charged at the car . . . . And I thought that

he was going to break the windshield or something."  She did not report the incident to police.  However, on February 3 and March 10, she called 9-1-1 to report that a "black man" was pushing over her garbage cans.

On April 12, 2017, around 5:30 a.m., Vera-Lopez went out to his car to leave for work.  Defendant approached his car, "bang[ed]" and "knock[ed]" his hands on the driver's side window and said something to Vera-Lopez. Vera-Lopez testified, "I don't understand that much of the English language; however, he was saying something, . . . [like] go and complain, police."  When Vera-Lopez began to roll down his window, defendant walked away.  At that time, Vera-Lopez did not call the police.

Around 3:00 p.m. that afternoon, defendant walked past the family's house while Vera-Lopez was sitting on the front steps.  Defendant began "insulting" him and saying "[f]**k you" in an "aggressive" tone.  Vera-Lopez replied, "[d]on't you remember what you did in the morning?"  He also told defendant "I don't want any problems."  Vera-Lopez testified defendant then got "in a position that he wanted to fight, that he wanted to fight like this."  Vera-Lopez demonstrated defendant's actions by "putting his two fists up in front of him one ahead of the other and he was angling his body a little bit to the side."

6

Garcia and Vera-Garcia called 9-1-1. Vera-Garcia then came outside. Vera-Garcia testified, "[defendant] was basically saying things like f**k you, you—I didn't steal anything, this is bulls**t, I should have f**ked you and him up, meaning me and my dad. Then my mom was on the porch and he said I should f**k that b***h up, too." He described defendant as "getting ready to fight my dad, has his hands up" and "[c]ocking his fist back."

Vera-Garcia confronted defendant about spitting on their cars and knocking over their trash cans. He testified:

> I was confronting [defendant] about the vandalism, saying you're the one that's been doing this, and then he said so what if I was, what are you going to do about it, saying—kind of antagonizing us to fight him, and I was saying I don't want to do anything about it but I want it to stop.

When police arrived, defendant "started yelling at [them] and insulting [them] again." Shortly after, defendant's father arrived in a black Jeep and drove off with defendant. Garcia testified that defendant called her "b**ch" and "motherf****r."

II.

In May 2017, defendant was charged by indictment with three counts of second-degree robbery, N.J.S.A. 2C:15-1(a)(1), and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d).

7

In June 2017, defendant was charged in a second indictment with three counts of first-degree witness tampering, N.J.S.A. 2C:28-5(a)(2); two counts of third-degree witness tampering, N.J.S.A. 2C:28-5(a)(2); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a); one count of first-degree terroristic threats, N.J.S.A. 2C:12-3(a); and one count of fourth-degree stalking, N.J.S.A. 2C:12-10(b).

The charges in both indictments were tried together. As to the charges from the first indictment, the jury convicted defendant only of a lesser-included petty disorderly persons offense of harassment, N.J.S.A. 2C:33-4(b), and of a lesser-included disorderly persons offense of simple assault, N.J.S.A. 2C:12-1(a)(1). As to the charges from the second indictment, the jury convicted defendant on all counts.

The trial court sentenced defendant to concurrent twelve-year prison terms on the first-degree witness-tampering convictions. The court merged the convictions for terroristic-threats into the witness-tampering sentences. The court also imposed a one-year term on the fourth-degree stalking conviction to run concurrent with the other prison terms and entered a permanent restraining order pursuant to N.J.S.A. 2C:12-10.1. For the convictions for petty disorderly

8

persons harassment and disorderly persons simple assault, the court imposed fines and penalties.

Defendant raised the following contentions for our consideration in his initial appellate brief:

POINT I

TO AVOID CONSTITUTIONAL INFIRMITY, THE WITNESS-TAMPERING STATUTE MUST BE INTERPRETED TO REQUIRE THAT THE DEFENDANT INTENDED HIS SPEECH OR CONDUCT TO CAUSE A WITNESS TO WITHOLD TESTIMONY.

A. The Witness-Tampering Statute Must be Construed to Require That a Defendant Subjectively Intends his Speech or Conduct to Cause a Witness to Withhold Testimony.

B. Gabriel's Convictions Must be Reversed Because the Jury was Not Required to Find That Gabriel Subjectively Intended His Speech and Conduct to Cause the Witnesses to Withhold Testimony.

POINT II

GABRIEL'S CONVICTIONS FOR MAKING TERRORISTIC THREATS MUST BE REVERSED BECAUSE N.J.S.A 2C:12-3(a) IS UNCONSTITUTIONALLY OVERBROAD.

POINT III

THE TRIAL COURT'S CHARGE ON FIRST-DEGREE WITNESS TAMPERING FAILED TO INFORM THE JURY THAT THE STATE MUST

9 <span>A-1066-19</span>

PROVE THAT GABRIEL KNEW THAT THE OFFICAL PROCEEDING INVOLVED A CRIME ENUMERATED IN N.J.S.A. 2C:43-7.2(d).

POINT IV

THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INSTRUCT THE JURY TO EXERCISE CAUTION IN EVALUATING ORAL STATEMENTS ALLEGEDLY MADE BY GABRIEL.

POINT V

THE CUMULATIVE EFFECT OF THE AFOREMENTIONED ERRORS DEPRIVED GABRIEL OF DUE PROCESS AND A FAIR TRIAL.

POINT VI

THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT IMPROPERLY USED GABRIEL'S MENTAL HEALTH DIAGNOSES TO FIND AGGRAVATING FACTORS AND ERRONEOUSLY REJECTED MITIGATING EVIDENCE.

Defendant raised the following contentions for our consideration in his reply brief:

POINT I

UNLESS THE WITNESS-TA[MP]ERING STATUTE IS NARROWLY CONSTRUED TO REQUIRE SPECIFIC INTENT OR KNOWLEDGE, IT IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE.

10                                    A-1066-19

POINT II

BECAUSE THERE IS NO WAY TO DISCERN
WHETHER THE JURY CONVICTED GABRIEL
UNDER THE FACIALLY UNCONSTITUTIONAL
PORTION OF THE TERRORISTIC THREATS
STATUTE, HIS CONVICTIONS MUST BE
REVERSED.

POINT III

THE STATE WAS REQUIRED TO PROVE THAT
GABRIEL KNEW THAT THE OFFICAL
PROCEEDING INVOLVED A CRIME
ENUMERATED IN N.J.S.A. 2C:43-7.2(d) TO
CONVICT GABRIEL OF FIRST-DEGREE WITNESS
TAMPERING.

POINT IV

THE MATTER SHOULD BE REMANDED FOR
RESENTENCING BECAUSE THE TRIAL COURT
IMPROPERLY USED GABRIEL'S MENTAL
HEALTH DIAGNOSES TO FIND THAT GABRIEL
WAS LIK[ELY] TO REOFFEND.

As noted, after the initial briefs were filed by the parties, the United States and New Jersey Supreme Courts issued opinions explaining the overbreadth doctrine in the context of terroristic-threat and witness-tampering prosecutions. We asked the parties to provide supplemental briefs. Defendant raises the following contentions for our consideration in his supplemental brief:

POINT I

BECAUSE GABRIEL WAS PROSECUTED FOR
WITNESS TAMPERING BASED ON THE

11

CONTENT OF HIS ALLEGEDLY THREATENING SPEECH, THE STATE NEEDED TO SATISFY THE STRICTURES OF THE TRUE-THREATS EXCEPTION.

POINT II

COUNTERMAN AND FAIR REQUIRE, IN A WITNESS-TAMPERING [PROSECUTION] BASED ON THREATENING SPEECH, THAT THE JURY BE INSTRUCTED ON A HIGHER MENS REA THAN REQUIRED BY THE MODEL CHARGE.

POINT III

THE REASONABLE-VICTIM STANDARD MUST ALSO APPLY TO THE OBJECTIVE ELEMENTS OF THE WITNESS-TAMPERING STATUTE.

III.

We need only briefly address defendant's contentions regarding his terroristic-threat convictions. In Fair, our Supreme Court considered "whether a prosecution for terroristic threats under N.J.S.A. 2C:12-3(a) premised on a mens rea of recklessness is constitutional. . . ." ___ N.J. at ___ (slip op. at 2). After reviewing the United States Supreme Court's opinion in Counterman, the Court held that a mental state of recklessness is constitutionally sufficient for a "true threat" prosecution under N.J.S.A. 2C:12-3(a). Id., slip op. at 23. However, the Court modified the trial judge's definition of recklessness for purposes of a true threats prosecution from acting "heedlessly, or foolhardily,"

12

to "morally culpable conduct, involving a 'deliberate decision to endanger another.'" Id., slip op. at 24-25 (quoting Counterman, 600 U.S. at 79). The Court also held an objective component is necessary for a true threats prosecution to survive constitutional scrutiny and, thus, the State must prove that a "reasonable person similarly situated to the victim" would have viewed the message as threatening violence. Id., slip op. at 29-32. Because the jury instructions failed to explain these new requirements, the Court vacated the defendant's conviction for terroristic threats and remanded for a new trial. Id., slip op. at 35.

In the matter before us, the State concedes the jury instructions have the same deficiencies that led the Court to reverse and remand for a new trial in Fair. Accordingly, we vacate defendant's convictions for terroristic threats and remand for a new trial on those counts.

IV.

We turn next to defendant's constitutional arguments with respect to his witness-tampering convictions. We begin by noting the State initially argued we should not consider this issue because defendant did not challenge the witness-tampering statute's constitutionality before the trial court. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) ("[A]ppellate courts will

decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))). At the time of trial, defendant did not have the benefit of the Supreme Court's decision in Hill, which now provides instruction on how to resolve First Amendment as-applied challenges to witness-tampering prosecutions. The State does not argue Hill should not be applied retroactively.[2] Accordingly, we address defendant's constitutional challenge to his witness-tampering convictions on its merits notwithstanding it was not presented to the trial court.

We begin our substantive analysis by recounting the pertinent facts and legal principles set forth in Hill. The defendant in Hill was charged with first-degree carjacking after the victim, A.Z., identified him in a photo array. ___ N.J. at ___ (slip op. at 4). While the defendant was detained awaiting trial, he sent a letter to A.Z. addressed to her home. Ibid. The defendant was not subject to a no-contact order. Ibid. He wrote in the letter, among other things,

---

[2] We note the State by its concession for partial remand implicitly acknowledges the rule announced in Fair applies retroactively to this case. We see no reason why the rule announced in Hill should be treated differently.

"[i]f it's me that you're claiming as the actor of this crime without a doubt, then disregard this correspondence. Otherwise please tell the truth if you're wrong or not sure 100%." Id., slip op. at 5.

At trial, A.Z. testified receiving the letter at her home "was terrifying" and made her "scared to" testify. Id., slip op. at 6-7. A redacted version of the letter was admitted into evidence and a detective read it aloud to the jury. Id., slip op. at 7. During opening and closing statements, the prosecutor focused on the letter's contents. Ibid.

The Supreme Court rejected the defendant's contention that N.J.S.A. 2C:28-5(a) is facially overbroad. Id., slip op. at 21. The Court noted "[m]any applications of N.J.S.A. 2C:28-5(a) are entirely unrelated to speech." Id., slip op. at 22. Further, "the heartland of witness[-]tampering prosecutions either do not involve speech at all, or prosecute unprotected speech, and therefore do not violate the First Amendment." Ibid.

The Court emphasized that even when a prosecution involves the content of speech, some types of speech fall outside the First Amendment's protections. Id., slip op. at 16. "Those historically unprotected categories of speech include fighting words, obscenity, child pornography, incitement, defamation, true threats, and speech integral to criminal conduct." Id., slip op. at 16-17 (citing

15

Counterman, 600 U.S. at 73-74; United States v. Hansen, 599 U.S. 762, 783 (2023)). The Court added that as to witness-tampering prosecutions involving speech, "garden-variety prosecutions are consistent with the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution because they involve speech that is integral to criminal conduct and is thus unprotected." Id., slip op. at 24.

Although the Court held N.J.S.A. 2C:28-5(a) is not facially overbroad, it concluded the statute may have been unconstitutionally applied in Hill. Id., slip op. at 27. The Court noted,

> had the jury been required to find that the contents of defendant's letter were speech integral to criminal conduct, the letter would have been unprotected by the First Amendment and there would be no issue with defendant's conviction. However, because the jury was not required to make such a finding, defendant's witness[-]tampering conviction must be vacated and remanded for a new trial.
>
> [Id., slip op. at 30.]

The Court further explained,

> [b]ecause the letter is facially innocuous, in order to prove that it was speech integral to witness tampering, the State was required to prove that defendant intended the letter to cause A.Z. to [engage in conduct prohibited by N.J.S.A. 2C:28-5]. In the trial below, the jury was not so charged. Therefore, defendant's conviction for witness tampering must be vacated.

16

[Id., slip op. at 30-31.]

## V.

We next apply the principles announced in Hill to the matter before us. The State's proofs generally pertained to defendant's conduct such as spitting on cars, knocking over garbage cans, and taking what could be characterized as a fighting stance—rather than his speech. To the extent the State presented evidence of defendant's verbal utterances, for the most part they were expletives.

But the oral message defendant delivered to the victims during the April 12, 2017 altercations was not limited to expletives.[3] For example, the State presented evidence that defendant stated to the victims, "I didn't steal anything, this is bulls**t." That speech is important because it suggests defendant's aggressive conduct and cursing on April 12, 2017 was in response to the victims' having accused him of robbery. Furthermore, as in Hill, the record shows defendant did not "explicitly ask" or "openly encourage" the victims to do any of the prohibited acts enumerated in N.J.S.A. 2C:28-5(a).[4]

---

[3] As the indictment makes clear, the prosecution for witness tampering focuses on the events that transpired on April 12, 2017.

[4] The Court in Hill noted:

A-1066-19

We conclude the witness-tampering prosecution was based, at least in part, on the content of defendant's oral speech on April 12, 2017. Consequently, for the witness-tampering prosecution to comport with the free speech protections outlined in Hill, the jury should have "been required to find that his speech fell into a recognized category of speech unprotected by the First Amendment." Id., slip op. at 29. Because that was not done, defendant's witness-tampering convictions "must be vacated to ensure that the statute is constitutionally applied to him." Id., slip op. at 33.

## VI.

Because we remand for a new trial on the witness-tampering charges, we address whether the jury should be instructed in accordance with the modified reasonable-person standard the Court adopted in Fair. The Court held, "the

---

Defendant's letter is not integral to the criminal act of tampering with a witness on its face. It does not explicitly ask A.Z. to testify falsely, withhold testimony, elude legal process, absent herself from any proceeding, or otherwise obstruct, delay, prevent or impede any official proceeding or investigation. It does not openly encourage A.Z. to do any of those things. And it does not threaten A.Z. if she continues to cooperate with the police or the prosecution.

[Id., slip op. at 30.]

18

objective inquiry, in which the jury determines whether a reasonable person would have viewed the defendant's words as threatening violence, must be undertaken not from the perspective of an anonymous ordinary person, but from the perspective of a <u>reasonable person similarly situated to the victim</u>." <u>Fair</u>, ___ N.J. at ___ (slip op. at 31). The Court explained this perspective "protects against convictions for statements made in jest, political dissent, or angry hyperbole, while allowing the State to prosecute true threats of violence that would instill fear of injury in a reasonable person in the victim's position." <u>Id.</u>, slip op. at 32. The Court added, "[t]his is another way of saying that context matters." <u>Ibid.</u>

The witness-tampering statute also includes a reasonable person element, requiring the State prove the actor "knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to [commit a prohibited act]." N.J.S.A. 2C:28-5(a). Because the Court in <u>Hill</u> was not dealing with a "true threats" situation, it had no occasion to address whether and in what circumstances the similarly situated modification should apply to a witness-tampering prosecution. <u>See</u> <u>supra</u> note 4 (noting the letter the <u>Hill</u> defendant mailed did "not threaten A.Z. if she continue[d] to cooperate with the police or prosecution").

We agree with defendant that in these circumstances, the same constitutional concerns prompting the <u>Fair</u> Court to apply an objective standard in that terroristic-threat prosecution also apply in the context of the present witness-tampering prosecution. Here, the evidence admitted at trial and the argument presented by the prosecutor in summation emphasized the threatening nature of defendant's conduct and speech. Indeed, the same evidence pertaining to defendant's speech was presented in support of both the terroristic-threat and witness-tampering prosecution theories. Given these circumstances, we conclude the jury should be instructed to apply the "similarly situated" modified standard not only to the counts charging defendant with making terroristic threats but also the counts charging witness tampering.

## VII.

We turn next to defendant's contention that to be convicted of first-degree witness tampering, the State must prove he knew the underlying official proceeding or investigation involved a crime enumerated in N.J.S.A. 2C:43-7.2, the No Early Release Act (NERA).[5] We are unpersuaded by defendant's interpretation of the witness-tampering statute.

---

[5] NERA is a sentencing statute that requires a defendant to serve eighty-five percent of the sentence imposed before becoming eligible for parole.

N.J.S.A. 2C:28-5(a) provides:

> Tampering. A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to:
>
> (1) Testify or inform falsely;
>
> (2) Withhold any testimony, information, document or thing;
>
> (3) Elude legal process summoning him to testify or supply evidence;
>
> (4) Absent himself from any proceeding or investigation to which he has been legally summoned; or
>
> (5) Otherwise obstruct, delay, prevent or impede an official proceeding or investigation.
>
> Witness tampering is a crime of the first degree if the conduct occurs in connection with an official proceeding or investigation involving any crime enumerated in subsection d. of section 2 of [NERA] and the actor employs force or threat of force. Witness tampering is a crime of the second degree if the actor employs force or threat of force. Otherwise it is a crime of the third degree.

It is well-settled that "[t]he overriding goal of all statutory interpretation 'is to determine as best we can the intent of the Legislature, and to give effect to that intent.'" State v. S.B., 230 N.J. 62, 67 (2017) (quoting State v. Robinson,

217 N.J. 594, 604 (2014)). As a result, "[t]o determine the Legislature's intent, we look to the statute's language and give those terms their plain and ordinary meaning . . . because 'the best indicator of that intent is the plain language chosen by the Legislature[.]'" State v. J.V., 242 N.J. 432, 442 (2020) (first citing DiProspero v. Penn, 183 N.J. 477, 492 (2005); and then quoting Johnson v. Roselle EZ Quick, LLC, 226 N.J. 370, 386 (2016)). Accordingly, "[i]f, based on a plain and ordinary reading of the statute, the statutory terms are clear and unambiguous, then the interpretative process ends, and we 'apply the law as written.'" Id. at 443 (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)). It is inappropriate for "'[a] court . . . [to] rewrite a plainly[ ]written enactment of the Legislature [or to] presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (third alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). Only "[i]f . . . the statutory text is ambiguous, [can courts] resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting S.B., 230 N.J. at 68). In the context of criminal statutes, "N.J.S.A. 2C:2-2(c)(1), . . . instructs that a statute's culpability requirement generally applies to all elements of a crime, 'unless a contrary

purpose plainly appears.'" State v. Gandhi, 201 N.J. 161, 177 (2010) (emphasis omitted).

The last paragraph of the statute establishes how a witness-tampering offense is graded. There can be no question that under Apprendi v. New Jersey, the jury must find, beyond a reasonable doubt, any fact (other a than prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum. 530 U.S. 466, 490 (2000). But while the jury must find beyond a reasonable doubt that the underlying proceeding—in this case a robbery prosecution—is designated as a NERA crime, we conclude the State need not prove defendant knew the pending robbery charge was so designated.

In reaching that conclusion, we find helpful guidance in State v. Dixon, 346 N.J. Super. 126 (App. Div. 2001), which addressed the gradation of the crime of fleeing from police, N.J.S.A. 2C:29-2(b). That statute provides the eluding offense is a third-degree crime "except that, a person is guilty of a crime of the second degree if the flight or attempt to elude creates a risk of death or injury to any person." N.J.S.A. 2C:29-2(b). The defendant asserted the jury should have been instructed they must find he "'knowingly created a risk of death or injury to anyone' in order to be convicted of second[-]degree eluding." Dixon,

346 N.J. Super. at 132 (emphasis omitted). In rejecting that construction of the

statute, Judge Stern, writing for the court, reasoned:

> [A] person may be found guilty of second-degree eluding only if the jury finds that his flight or attempt to elude created a risk of death or injury to any person. State v. Wallace, 158 N.J. 552, 560 (1999) (finding that "the statute was designed to punish those who elude the police and . . . whose unlawful conduct creates a possibility of injury to others[]"). See also Apprendi[,] 530 U.S. 466 (2000); State v. Johnson, 166 N.J. 523 (2001). Our Supreme Court has determined that a permissive inference may be established through evidence that defendant "violated one or more motor vehicle statutes" during the chase. Wallace, . . . 158 N.J. at 558-559. However, the term "knowingly" does not relate to the risk which aggravates the eluding and makes it a second[-]degree crime. The relevant clauses in N.J.S.A. 2C:29-2[(b)] are separated by a semi-colon, and there is no culpability requirement independent of the third[-]degree crime. We, therefore, reject defendant's contention that the judge erred by failing to instruct the jury that it had to find that the defendant "knowingly" created a risk of death or injury to another person.
>
> We recognize that N.J.S.A. 2C:2-2[(c)](3) requires a "knowing" culpability where culpability is intended and the Code is otherwise silent. We also recognize that the "risk of death or injury" factor, whether considered a sentence enhancer or element of the second[-]degree crime, requires a jury finding of proof beyond a reasonable doubt. See Apprendi[,]530 U.S. at 495-97 []; [Johnson], . . ., 166 N.J. at 549; N.J.S.A. 2C:1-13(a). Nevertheless, the structure of N.J.S.A. 2C:29-2[(b)], and a reasonable reading of its provisions, results in a construction that a defendant

24

A-1066-19

> need not knowingly create the risk so long as the defendant, as in this case, is found to have committed third degree eluding with the requisite knowing culpability. Cf. State v. Mendez, 345 N.J. Super. 498 (App. Div. 2001) (indicating "knowingly flees or attempts to elude" requires knowing culpability). See also State v. Burford, 163 N.J. 16, 20 (2000).
>
> [Id. at 135-36.]

In this instance, the gradation provision of the witness-tampering statute is not just set off by a semi-colon, but rather is a separate paragraph in the statute.

We find further support for our conclusion in Judge Stern's decision in State v. Moore, 304 N.J. Super. 135 (App. Div. 1997). In that drug trafficking case, we held the prosecution at trial need not prove the defendant knew the amount of controlled dangerous substance involved, even though the State must prove the weight involved beyond a reasonable doubt in determining the degree of the crime. Id. at 145-46.

We add that in the present matter, defendant had been arrested and formally charged by complaint-warrant with robbery, constituting the "official proceeding" for purposes of the witness-tampering prosecution. But N.J.S.A. 2C:28-5 expressly provides a person can be convicted of tampering with an "investigation." That term includes investigations that are ongoing and have not yet resulted in formal charges. Indeed, the statute expressly includes

25

investigations that are "about to be instituted." It makes no sense to interpret the statute to require proof that defendant knew a crime specifically designated in NERA would eventually be charged.

We note, finally, that Title 2C makes clear the State need not prove a defendant knows that their conduct is illegal. See N.J.S.A. 2C:2-2(d).[6] It follows the State need not prove a defendant knows the mandatory parole ineligibility period that would be imposed on conviction for a particular crime. In the context of a witness-tampering prosecution, it is enough that the State proves the defendant knew "that an official proceeding or investigation is pending or about to be instituted."

---

[6] N.J.S.A. 2C:2-2(d) provides:

> Culpability as to illegality of conduct. Neither knowledge nor recklessness nor negligence as to whether conduct constitutes an offense or as to the existence, meaning or application of the law determining the elements of an offense is an element of such offense, unless the definition of the offense or the code so provides.
>
> [N.J.S.A. 2C:2-2(d).]

VIII.

We next address defendant's contention the trial court committed plain error by failing to sua sponte instruct the jury to exercise caution in evaluating oral statements defendant allegedly made. In <u>State v. Kociolek</u>, our Supreme Court held that when a defendant makes an inculpatory statement to any witness,[7] the jury should be instructed to "receive, weigh and consider such evidence with caution, in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." 23 N.J. 400, 421 (1957) (internal quotation marks omitted). The State acknowledges a <u>Kociolek</u> charge would have been appropriate but contends the trial court's failure to give that charge sua sponte does not constitute plain error. At a new trial on remand, we presume defendant will request that jury instruction, the State will not object, and the trial court will give it. However, defendant's plain error argument is not moot because it is a

---

[7] In <u>State v. Hampton</u>, the Court adopted a similar rule with respect to statements made by defendants to police. 61 N.J. 250, 271-72 (1972).

A-1066-19

basis to challenge his stalking conviction.[8]  We review defendant's plain error contention in the context of that conviction.

It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial."  State v. Concepcion, 111 N.J. 373, 379 (1988).  However, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case."  State v. Singleton, 211 N.J. 157, 182 (2012).  With respect to jury instructions, "plain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'"  State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

---

[8] Defendant's appellate brief does not explicitly address his stalking conviction. However, in the point asserting that the trial court committed plain error by failing to instruct the jury to exercise caution in evaluating oral statements allegedly made by defendant, defendant concludes in the last sentence, "[f]or these reasons, all of [defendant's] convictions should be reversed."  (emphasis added).

The mere possibility of an unjust result is not enough to warrant reversal of a conviction. State v. Jordan, 147 N.J. 409, 422 (1997). Furthermore, "[t]he error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289); see also State v. Crumb, 307 N.J. Super. 204, 251 (App. Div. 1997) (holding "[w]here such a charge has not been given, its absence must be viewed within the factual context of the case and the charge as a whole to determine whether its omission was capable of producing an unjust result").

Our Supreme Court has specifically held that failure to give a Kociolek charge does not automatically constitute plain error. In State v. Harris, 156 N.J. 122, 183 (1998), for example, the Court held "[t]he omission of the Kociolek and Hampton charges, in the context of the State's entire case against [the] defendant, was not clearly capable of producing an unjust result" because defense counsel tested the witness' credibility through a "devastating cross-examination." See also Jordan, 147 N.J. at 428 (noting it would be "a rare case where failure to give a Kociolek charge alone is sufficient to constitute reversible error").

In the matter before us, the trial court provided the jury with a general credibility instruction, explaining:

> As the judges of the facts, you are to determine the credibility of the witnesses and, in determining whether a witness is worthy of belief and therefore credible, you may take into consideration: the appearance and demeanor of the witnesses; the manner in which he or she may have testified; the witness's interest in the outcome of the [t]rial, if any; his or her means of obtaining knowledge of the facts; the witness's power of discernment, meaning his or her . . . judgment, understanding; his or her ability to reason, observe, recollect, and relate; the possible bias, if any, in favor of the side for whom the witness testified; the extent to which, if at all, each witness is either corroborated or contradicted, supported or discredited by other evidence; whether the witness testified with an intent to deceive you; the reasonableness or unreasonableness of the testimony the witness has given; whether the witness made any inconsistent or contradictory statements; and any and all other matters in the evidence which serve to support or discredit his or her testimony.

Additionally, at trial, defense counsel thoroughly cross-examined the prosecution witnesses about the statements they attributed to defendant. The jury also heard Garcia and Vera-Lopez testify with the aid of a Spanish interpreter. The jury thus had the opportunity to consider the witnesses' English language skills, their credibility, and their recollection of defendant's statements. Furthermore, the jury acquitted defendant of numerous charges,

30

including robbery, assault, and possession of a weapon for an unlawful purpose. These acquittals suggest the jury carefully considered the reliability of the witnesses' testimony. We therefore conclude defendant has not established a basis to overturn his stalking conviction.

IX.

Because we are vacating defendant's terroristic-threat and witness-tampering convictions, and because defendant's Kociolek argument is the only error asserted with respect to the stalking conviction, we need not address defendant's cumulative error contention. We likewise decline to address defendant's sentencing contentions pending the resolution of the terroristic-threat and witness-tampering charges on remand.

Vacated and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1066-19