# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1071-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

J.D.,

     Defendant-Appellant,

and

F.P.-L., S.O., M.A., and A.G.,

     Defendants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF M.D.,
O.C.D., and C.G., minors.

_____

     Submitted May 7, 2025 – Decided July 7, 2025

     Before Judges Mayer and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0068-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Beth Anne Hahn, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant J.D. (John)[1] appeals from the August 11, 2023 order of the

Family Part finding he abused and neglected three children. We affirm.

---

[1] We identify the parties and children by initials pursuant to Rule 1:38-3(d)(12).

A-1071-23

I.

John is the biological father of M.D. (Marie) and O.C.D. (Charlie), who were minors at the times relevant to this appeal. He and his children lived with his paramour, defendant A.G. (Amy), and her infant son C.G. (Chad).[2]

On December 24, 2020, a pediatric urgent care center contacted plaintiff Division of Child Protection and Permanency (DCPP) to report concerns about Chad, then twenty-two-months old, after he was evaluated for abdominal pain. Medical staff reported Chad had an "enormously extended belly with bruising all over his abdomen," more extensive bruising on his right side, and had been in pain and suffering from diarrhea for a week. Amy told medical staff Chad's bruising was from playing with the other children. Staff also observed bruising on Chad's left lower jaw and central forehead, which Amy said was from falling out of bed. The medical staff did not find Amy's explanations consistent with Chad's injuries, determined the child "seemed very unwell," and instructed Amy to bring Chad directly to the emergency room.

Amy took Chad to St. Joseph's University Medical Center, where she was met by DCPP Special Response Unit (SRU) workers. Amy told the SRU

---

[2] Defendant M.A. is Chad's biological father. Defendants F.P.-L. and S.O. are Marie and Charlie's biological mothers, respectively. No findings were made against Amy, M.A., F.P.-L., or S.O., and they are not parties to this appeal.

A-1071-23

workers Chad had been in pain for a week, but his pediatrician did not think there was anything wrong with him. Amy stated Chad's belly button was "pushed out" but the pediatrician instructed her that when that happens "to push it back in." She said she brought Chad to urgent care because his stomach was very bloated and he was complaining of pain. The SRU workers observed and photographed Chad's bruises and contacted the Passaic County Prosecutor's Office (PCPO), which opened an investigation.

Medical staff discovered Chad suffered from a bucket-handle tear to the connective tissue which attaches the intestines to the posterior wall of the abdomen. The injury occurred in two steps: the immediate ripping of the bowel off the abdomen wall, followed by devascularization – a lack of blood flow – to the intestines. The injury causes cells to die, leaving the affected areas susceptible to necrosis, which, if untreated, leads to sepsis, low blood pressure, and death.

Later that night, Chad underwent surgery to remove about a foot of his intestines considered "dead muscle." Hospital staff expressed concerns Chad's abdominal injury was non-accidental. He remained hospitalized until December 31, 2020.

The following day, after learning Marie and Charlie resided with John and Amy, DCPP workers visited the family home to implement a safety protection plan (SPP). Under the SPP, John agreed to have a family friend stay in the home to supervise contact between John, Amy, and the children. John told DCPP workers he was aware of Chad's abdominal injury, but denied knowing its cause. He speculated Chad may have hurt himself by "jumping around." John stated Amy had taken Chad to the doctor three times in the past month and attributed the child's jaw and forehead bruises to him having fallen off a bed.

John said Amy moved into his home with Chad in November 2020. According to John, the child was not sick when he moved into the home. Because John and Amy worked different shifts – he from 5:00 p.m. to 12:00 a.m. and she from 3:00 a.m. to 7:00 a.m. – they shared child care responsibilities.

DCPP workers interviewed Marie and Charlie. Five-year-old Marie said she was sad because Chad had been "cut in the stomach." She described Chad's stomach as "very big" and said he had been sick and was "always throwing up and pooping around the house." She stated Chad had vomited on the couch before going to the hospital. Eight-year-old Charlie explained Chad was not in the house because he had to go to the doctor for his stomach because his "belly was so big."

5

DCPP workers returned to the home on December 28, 2020. Amy told the DCPP caseworker she "recently" learned Marie had hit Chad in the stomach with a hammer after Chad bit her a week or two earlier. Amy denied hearing Chad cry or complain of pain when the incident happened and denied seeing any bruises on the child. Amy claimed she was not aware of the incident until Marie told her about it.

A PCPO investigator interviewed Marie and Charlie the next day, December 29, 2020. The interviews were recorded on video. Marie said she injured Chad when she hit him in the stomach with a hammer after Chad bit her on the wrist. She described the hammer, which she obtained from a suitcase in the living room, as "heavy" and "hard." Marie first said Chad was standing up when she hit him and did not fall down when he was struck. She later changed her story and said Chad fell after being hit. Marie said after she struck Chad he cried until she gave him a hug and a kiss. According to Marie, Chad then got into his own bed and went to sleep.

Charlie told the investigator Marie had a hammer in her hand when he saw Chad bite Marie on the arm. Charlie then saw Marie hit Chad with the hammer. Charlie said Chad was standing up when he was hit with the hammer, did not fall, and started to cry. Charlie stated he took the hammer from Marie, gave

Chad a hug, and told Marie to sit down. According to Charlie, Chad stopped crying after the hug and followed him out of the room as he returned the hammer to the suitcase in the living room.

John told a DCPP case worker Amy was sometimes "really aggressive." He claimed on one occasion, Amy was upset about an unknown number appearing on his cellphone and put her hands around his neck to choke him. John said Amy stopped only when she could see in his eyes that "she was about to kill him." John also said he knew Chad had a "fingerprint bruise" on his belly from Marie trying to carry the child.

On January 5, 2021, DCPP filed a verified complaint in the Family Part for the care, custody, and supervision of Marie, Charlie, and Chad, and effectuated an emergency removal of the children from the home. Marie and Charlie were placed with their paternal grandmother. Chad was placed with his paternal great-grandmother.

On January 7, 2021, Marie and Charlie's paternal grandmother contacted DCPP and stated Charlie told her he and Marie "had not been honest" during their interviews with the PCPO investigator. Charlie told his grandmother Marie did not hit Chad with a hammer.

A-1071-23

On January 8, 2021, the children were reinterviewed by the PCPO investigator. When asked to tell the truth, Charlie said, "I will this time." He disclosed it was not Marie who hit Chad in the stomach, but John. Charlie reported John hit Chad every night and the last time was "before he started throwing up every day and before his tummy started getting huger." Charlie, who shared a bedroom with Chad and Marie, was pretending to be asleep when he saw John punch Chad in the stomach. When asked how John struck Chad, Charlie pointed to the side of his stomach below the ribs and made a closed-hand fist. After observing the initial punch, Charlie saw John take Chad into the living room. Although Charlie could not see into the living room, he heard John continue to hit Chad. Charlie heard Chad crying and John say to him, "shh, shh. Come on, shh." Charlie also stated, however, that John struck Chad in the bathroom and he heard Chad fall into the bathtub after being struck. It is not clear if this was an alternative version of events or if the bathroom assault took place before or after John struck Chad in the bedroom and living room. Charlie stated Amy was not home when the assault took place.

Charlie said John later told him if he and Marie did not say Marie hit Chad with a hammer, John would "go to jail." John also "bribe[d]" Charlie with money to blame Marie for Chad's injuries. Charlie said John physically abused

8

him as well. He described John hitting him with a metal action figure, which caused him to have what he described as "a broken arm" for a few days, kicking him in the leg, and striking him with a belt. Charlie said when other people were present John would act as if he was giving him a hug, but would squeeze and pinch the back of his neck. Charlie discussed hiding heavy objects John might use to assault him and removing large sticks from their yard so John would not use them as weapons against the children. He said Marie gets hurt by John more often than he does.

At her second interview, Marie initially refused to talk about the "thing that we talked about last time." She then provided a mixed statement about what happened to Chad – both admitting and denying she hit Chad with a hammer. At times, she said she hurt Chad and John did not hit him, but at other times she denied hurting Chad and disclosed John said, "tell [them] you hit [Chad] . . . and I'll give you toys." She reported John had bought her a "Barbie" for saying she hit Chad with a hammer. Marie also stated John told her "they will put him in prison" if she reported he hit Chad. Marie disclosed John also hits her.

In February 2021, John was arrested and charged with second-degree assault, N.J.S.A. 2C:12-1(a), third-degree aggravated assault, N.J.S.A. 2C:12-1(b), three counts of endangering the welfare of a child, N.J.S.A. 2C:24-4, two

counts of witness tampering, N.J.S.A. 2C:28-5, and two counts of bribery of a witness, N.J.S.A. 2C:28-5(c).  Because of the criminal charges, John's visits with Marie and Charlie were suspended.[3]

In March and April 2021, Marie and Charlie underwent psychosocial evaluations at Audrey Hepburn Children's House (AHCH), a regional diagnostic and treatment center for child abuse and neglect.  See N.J.S.A. 9:6-8.99.  Marie reported she was in the room when John hit Chad; she did not witness the incident, but woke up to Chad crying.  She disclosed John "said to pretend that I hit him with a hammer . . . I didn't actually do that."  She said she was "kinda sad" John told her to falsely take the blame for injuring Chad and "sad" John was in jail.  Marie disclosed physical abuse by John, including getting hit with a belt, which she said hurt and left a mark.  AHCH staff found physical and psychological abuse of Marie by John was clinically supported, and recommended Marie for individual trauma-focused therapy.

During his AHCH evaluation, Charlie said "[w]e need a home . . . .  That's the reason I'm in foster care.  One little lie changed my whole life.  My dad hit a one-year old in the stomach."  Charlie identified Chad as the one-year old who John struck and elaborated he hit Chad in the stomach twice with a closed fist.

---

[3]  The outcome of the criminal charges is not addressed in the record.

A-1071-23

Charlie explained John had tried to blame Marie for Chad's injuries, but Charlie had witnessed the assault while pretending to be asleep. Charlie said he told Marie about John's assault on Chad, but no one else because he "would've gotten hurt if [he] said something and his dad found out." John had warned him, "[d]on't tell anyone if you don't want me to go to jail." Charlie responded, "I'm only doing something if you give me money." Although John acquiesced and gave Charlie money, Charlie ultimately "told [the truth] because that's what [he is] supposed to do."

Charlie said he was "sad, angry, and upset" and appeared distressed when describing how John hit Chad. Charlie also described instances of physical abuse of him by John, including striking his arm and kicking his leg. AHCH staff determined Charlie's symptoms were consistent with acute stress disorder and recommended individual trauma-focused therapy to address his emotional experience with John.

The court held a six-day fact-finding hearing over a period of several months. DCPP called as witnesses: (1) the family's DCPP case worker; (2) the PCPO investigator who twice interviewed Marie and Charlie; (3) Dr. Brett Biller, the Mental Health Director of AHCH, who was qualified by the court as an expert in clinical psychology with a specialty in child maltreatment; and (4)

11

Advanced Nurse Practitioner Marybeth Mariano, who was qualified by the court as an expert in advanced practice nursing with a specialty in child abuse medical evaluations. The Law Guardian did not offer evidence or testimony, but supported DCPP's findings. John testified on his own behalf and called Amy as a witness over her objection.[4]

The PCPO investigator described her training and explained that during the interviews with Marie and Chad she used forensic interviewing techniques, including open-ended questions, to allow the children to discuss Chad's injuries without being influenced by her. However, the investigator acknowledged she used leading questions after the children made disclosures of abuse by John to elicit further details.

The video recordings of the interviews were admitted into evidence without objection. Initially, technical issues interfered with the effective transmission of the audio portion of the interviews. The difficulty was compounded by Marie's low volume when answering questions and the face

---

[4] On the first day of the hearing, John's counsel advised the court that in conjunction with John's criminal case, he had applied to the Office of the Public Defender (OPD) for payment for an expert. On the second day of the hearing, John's counsel informed the court retention of an expert was "just approved" by OPD. Months later, he told the court there "was a delay" in securing OPD's agreement to pay for an expert and he "could not get a witness."

masks the investigator and children were wearing pursuant to COVID-19 protocols. The transcripts of the hearings contain many indications that the audio portion of the recordings were indecipherable. Frequently, after Marie answered a question from the investigator in a low volume, the investigator repeated Marie's answer in a volume that was more easily heard. The court noted hearsay concerns with the investigator's "repeater's statements," but also stated it was relying on the "repeater's statements" as accurate descriptions of Marie's answers to the investigator's questions.

Biller explained the bases for the AHCH staff's diagnoses for Marie and Charlie. Biller noted that in addition to being physically abused by John, Marie suffered an extensive emotional impact by having been directed to accept responsibility for Chad's injuries. That demand by John subjected Marie at a young age to the weight of being responsible for maintaining the family's functioning. Biller explained that Charlie, in addition to suffering physical abuse by John, had repetitive thoughts about being asked to blame Marie for Chad's injuries, which he found distracting and, at times, difficult to manage. Biller opined Charlie provided idiosyncratic details about his abuse that would not ordinarily be known to a child unless they had actually experienced what they described.

A-1071-23

Mariano described Chad's injuries in detail. She opined Chad's life-threatening internal injuries were caused by non-accidental blunt abdominal trauma. According to Mariano, the type of extensive injuries suffered by Chad are rare, especially for a child. While these types of injures can be caused by a high-velocity accidental trauma, such as a car crash or a fall from a height, no such history was provided for Chad. Mariano opined Chad's injuries could be caused by a punch, which is consistent with the reported cause of Chad's injuries. Mariano testified Chad would have developed bruises within a few hours to a day of his injuries and would likely not have been able to climb onto a bed afterwards because he would need abdominal muscles to do so.

Mariano also opined Chad had a healing fracture of his tenth rib, which was at least seven to ten days old when he was treated for his abdominal injury. She testified ribs in young children have a high plasticity, making them less likely to fracture. Rare rib fractures in children can occur from high velocity events, like car crashes. As noted, Chad had no history of such an event. Mariano opined based on the timing of the onset of Chad's symptoms, it was "very unlikely" he sustained the rib fracture at the same time as his internal injuries. She opined Chad suffered multiple points of impact and sustained injuries as the result of different traumatic events. These observations were

14

inconsistent with the child being injured by a single hammer strike by another child. Mariano opined Chad's injuries were consistent with Charlie's description of John frequently striking Chad and punching him repeatedly on a single night.

John denied hitting Chad. He testified Chad's stomach became extended over a period of a few hours after he drank a pediatric nutrition drink shortly before Amy took him to a pediatrician. John claims he saw a red mark on Chad's side and that it looked to him "like [Chad] was hit." When he asked Amy about the mark, she attributed it to Chad falling off the bed and hitting a box of toys. According to John, he frequently returned home from work to find Chad, who had been in Amy's care, with red marks. John did not know what transpired during Chad's medical treatment and never spoke with the pediatrician. John denied telling Marie and Charlie to attribute Chad's injuries to Marie and denied bribing either child to give false statements to the PCPO investigator or DCPP.

Amy testified she took Chad to the pediatrician about a week prior to his surgery because he "looked upset and sick" and did not want to play. She said the doctor was not concerned about Chad's swollen stomach and provided no treatment. She brought Chad to urgent care a few days later when his condition worsened. Amy denied knowing what caused Chad's injuries. On cross-

15

examination, Amy could not explain why the pediatrician's medical records contained no indication Chad was examined for a swollen stomach.

On August 11, 2023, Judge Barbara J. Buono Stanton issued an oral decision in which she found pursuant to N.J.S.A. 9:6-8.21(c)(1) and (4)(b) DCPP established by a preponderance of the evidence John had abused and neglected Marie, Charlie, and Chad.  Judge Stanton found John inflicted or allowed to be inflicted on Chad physical injury other than by accidental means which caused or created a substantial risk of injury, death, or serious protracted disfigurement, or loss or impairment of function of any bodily organ.  In addition, the judge found John impaired or placed in imminent danger of impairment the children's physical, mental, or emotional condition as a result of his failure to exercise a minimal degree of care and provide proper supervision by unreasonably inflicting or allowing to be inflicted harm or the substantial risk therefore by inflicting excessive corporal punishment or other similar acts.

Judge Stanton found John's testimony to be "unreasonable and not worthy of belief."  She noted he made inconsistent statements and his testimony was contradicted by credible evidence.  The judge also found Amy's testimony to lack credibility.  The judge found Amy's "responses were guarded," "[h]er

16

demeanor was concerning" and "[h]er lack of outrage or concern for the type of injuries and the cause thereof of [Chad's] injuries was remarkable."

Judge Stanton found the testimony of the experts with respect to the extent and likely cause of Chad's injuries, and the lasting emotional impact of John's behavior on Marie and Charlie to be credible.

In addition, Judge Stanton found "overwhelming corroboration" for the out-of-court statements of Marie and Charlie that John abused and neglected them and Chad. The judge stated: "When I look at all the types of corroborating evidence that's permitted by case law, I find that there have been literally every form presented in this case . . . ." The judge found Marie's and Charlie's statements cross-corroborate each other. They both disclosed John struck Chad in the stomach, told them to blame Marie, and gave them bribes in exchange for lying. Judge Stanton found the testimony of both experts corroborated Marie and Charlie's out-of-court statements.

The judge found John's testimony also corroborated Marie's and Charlie's out-of-court statements. The judge found John's attempts to blame Amy and Marie for Chad's injuries, in effect, corroborated the children's statements Chad was not injured accidentally.

A-1071-23

Judge Stanton concluded there is "no question" the harm John inflicted on Chad constituted abuse and neglect under N.J.S.A. 9:6-8.21(c)(1) and (4)(b). In addition, the judge concluded the harm John inflicted on Chad supported a finding of abuse and neglect against Marie and Charlie by putting them at risk of emotional harm given their presence when John assaulted Chad, gravely injuring the child, and attempted to coerce the children to blame Marie for Chad's injuries. An August 11, 2023 order memorialized the court's findings.

On November 6, 2023, the court entered an order terminating the litigation because the Division filed a complaint to terminate John's parental rights.

This appeal of the August 11, 2023 order followed. John raises the following arguments.

> POINT I
>
> THE VIDEOTAPED STATEMENTS, WHICH RESULTED FROM IMPROPER QUESTIONING, WERE NOT THE "BEST EVIDENCE" AND THEREFORE LACK EVIDENTIARY VALUE. THE COURT'S RELIANCE UPON SAME DENIED JOHN HIS RIGHT TO DUE PROCESS.
>
> POINT II
>
> THE "REPEATER'S" STATEMENTS WERE INADMISSIBLE. THE CHILDREN'S OUT-OF-COURT STATEMENTS WERE NOT CORROBORATED.

18

POINT III

TRIAL COUNSEL'S IGNORANCE OF THE LAW
DEPRIVED JOHN OF HIS RIGHT TO THE
EFFECTIVE ASSISTANCE OF COUNSEL.

The Law Guardian for Marie and Charlie opposes John's appeal and argues the August 11, 2023 order should be affirmed.

## II.

We defer to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters," Cesare v. Cesare, 154 N.J. 394, 413 (1998), their "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand[,] [and their] feel of the case that can never be realized by a review of the cold record," N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). Fact-finding that is supported by "substantial credible evidence in the record" is upheld. N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010). However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).

A-1071-23

The "main focus" of Title Nine, of which N.J.S.A. 9:6-8.21(c)(1) and (4)(b) are a part, is "the protection of children." Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 177 (1999)). Under Title Nine, a child is "[a]bused or neglected" when a

> parent or guardian . . . inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ . . . .
>
> [N.J.S.A. 9:6-8.21(c)(1).]

In addition, an abused and neglected child under Title Nine is one

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [a] parent . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Under N.J.S.A. 9:6-8.21(c)(4)(b), minimum degree of care "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157

N.J. at 178. To justify a finding of abuse and neglect, more is required than ordinary negligence, but less is needed than an intentional infliction of injury. Ibid. "[A] guardian fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181.

In finding neglect, the court must base its determination on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). A finding of neglect must be supported by a preponderance of the evidence. N.J.S.A. 9:6-8.46(b); N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 398 (2009).

A child's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Therefore, "a child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse or neglect." N.J. Div. of Child Prot. & Permanency v. J.A., 436 N.J. Super. 61, 67 (App. Div. 2014) (quoting N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011)).

Having reviewed John's arguments in light of the record and applicable legal principles, we affirm the August 11, 2023 order for the reasons stated by Judge Buono Stanton in her thorough and well-reasoned oral decision. We add the following comments.

We are not persuaded by John's arguments: (1) due process required DCPP produce Marie and Charlie for cross-examination; (2) the trial court should have interviewed Marie and Charlie in camera with defense counsel watching from the courtroom and able to interpose questions; (3) the recordings were not the best evidence of the interviews of Marie and Charlie because it was difficult to hear Marie and Charlie answer some of the investigator's questions and the investigator repeated many of Marie's answers; (4) the PCPO investigator asked Marie and Charlie leading questions, tainting the evidentiary value of their out-of-court statements; (5) the trial court inappropriately relied on the investigator's repeating of Marie's answers; and (6) the record contains insufficient evidence corroborating Marie and Charlie's out-of-court statements.

John did not subpoena Marie and Charlie to testify, ask the judge to independently interview them, or object to admission of their recorded interviews. John therefore "deprived [DCPP] of the opportunity to overcome

A-1071-23

any objection and deprived the trial court of the necessity to make a ruling based on the arguments presented by both sides."  M.C. III, 201 N.J. at 341.

> It is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest."
>
> [Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)).]

We decline to address John's due process arguments.  We note, however, in the criminal context, defendants are deemed to have waived their Sixth Amendment right to confront witnesses if they fail to assert that right in a timely fashion.  See State v. Williams, 219 N.J. 89, 99 (2014).  In some instances, defendants in criminal trials strategically choose not to cross-examine witnesses. See, e.g., State v. Nyhammer, 197 N.J. 383, 413-14 (2009).  John may well have decided as a matter of strategy to avoid the evidentiary weight of live testimony, particularly from Charlie who in his second interview unequivocally described John's assault on Chad and subsequent effort to bribe Charlie to blame Marie for Chad's injuries.

We also note John does not have the guaranteed right to cross-examine Marie and Charlie under the circumstances of this Title Nine hearing.  See N.J.

Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016) (reiterating that the Sixth Amendment right to confrontation applies to criminal but not civil proceedings); but see N.J. Div. of Child Prot. & Permanency v. C.W., 435 N.J. Super. 130, 142 (App. Div. 2014) (due process warrants some level of confrontation right, but the court must also "prevent further victimization or traumatization of young children" who are witnesses).

John also did not raise his best evidence argument in the trial court. We therefore decline to review that issue. We note, however, N.J.R.E. 1002 requires "the original writing or photograph" to prove the contents of that evidence, except as otherwise provided in the rules of evidence or a statute. Recordings, such as the recordings of the interviews of Marie and Charlie, must satisfy the rule, N.J.R.E. 801(e), but a "duplicate" recording is also permissible, N.J.R.E. 1001(c)-(d), unless there is a "genuine question . . . about the original's authenticity or the circumstances make it unfair to admit the duplicate." N.J.R.E. 1003. There was no dispute raised at trial or on appeal as to the investigators' authentication of the recordings and the circumstances did not make admission of the duplicate recordings unfair. Thus, "best evidence" rule was satisfied.

While portions of the recordings were difficult to hear, that fact alone does not render the recordings inadmissible or entirely lacking in evidentiary value. The trial court considered the indecipherable portions of the recordings when determining whether the audible portions of children's statements were credible and corroborated by other evidence in the record. We have reviewed the recordings and the record and are satisfied the trial court's findings with respect to credibility and corroboration of the recorded statements of Marie and Charlie are amply supported. We discern nothing in the investigator's techniques that rendered the statements of Marie and Charlie unreliable. Nor do we conclude the trial court's reliance on the investigator's repetition of some of the children's answers sufficient to warrant reversal of the August 11, 2023 order.

We have reviewed John's remaining arguments, including that his trial counsel was ineffective, and to the extent we have not specifically addressed any of them, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

25

A-1071-23